THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
FRANK LOUIS KINCAID, Defendant-Appellant.

Fourth District    No. 15891

Opinion filed August 25, 1980.—Rehearing denied September 19, 1980.

CRAVEN, J., dissenting.

Richard J. Wilson and Janet Sinder, both of State Appellate Defender's Office, of Springfield, for appellant.

Patrick M. Walsh, State's Attorney, of Decatur (Gary J. Anderson and Robert J. Biderman, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE MILLS delivered the opinion of the court:
Indecent liberties.
Bench trial.
Guilty.
Five years.
Two of us affirm—one dissents.

## Issues
On appeal, Kincaid asserts that: (1) his confession was involuntary and should have been suppressed; (2) the trial court erred in allowing the State to amend the information; and (3) the trial court abused its discretion in allowing the victim to testify without properly ascertaining his competency.

## Facts
Kincaid was charged with taking indecent liberties with a child and contributing to the sexual delinquency of a child. Prior to trial, defendant filed a motion to suppress his statements made to the police officers. At the suppression hearing, Detective Roy Glick testified that he interviewed the defendant at 7:43 p.m. on the day of his arrest. Defendant was given *Miranda* warnings and agreed to talk to Detective Glick. Defendant said that Warren Hopkins had spent one night at his apartment. Shortly after Warren arrived, defendant left for work, leaving Warren with defendant's sister, girlfriend, and daughter. Defendant denied being involved in the acts charged.

Detective Glick later spoke to Officers Kretsinger and Ryan about the interview. He told them that defendant should be interviewed again before being transferred to the county jail because he had learned that defendant had not worked on the night in question.

Sergeant Virgil Stolz testified that he spoke to defendant at the city jail at about 9 p.m. on the night of defendant's arrest. Defendant told Stolz that he had taken approximately 15 tablets of Erythromycin before he was arrested. Sergeant Stolz called the hospital and spoke to Dr. Miller who told the officer that the only effect of such a pill dosage would be an upset stomach.

Officer Richard Steele stated that at 9:20 p.m. he noticed defendant in a jail cell with a shirt tied to one of the bars and around his neck. The shirt was tied to a bar about two feet from the ground and defendant was sitting on the floor of the cell. The officer cut the shirt. He did not remember whether defendant was unconscious, but the defendant was coughing and gagging. The defendant was then taken to the emergency room of Decatur Memorial Hospital.

In the emergency room, Dr. Miller examined the defendant. At this time, defendant was angry, uncooperative and upset, and while being treated, defendant bit a thermometer in half. Defendant was given an injection of 5 milligrams of Haldol, a major tranquilizer, at about 10:20 p.m. Haldol blocks or reduces anger by blocking adrenalin. Dr. Miller stated that Haldol would not cause a person to become disoriented or lose his will or rationality, but it would help him think more rationally. The possible side effects listed in the Physicians Desk Reference included insomnia, restlessness, anxiety, euphoria, agitation, drowsiness, depression, lethargy, headache, confusion, vertigo, and grand mal seizures. Dr. Miller said that the drug's effects would last approximately one day. The maximum effect would occur between one and six hours after the drug was administered. Defendant was released 35 minutes after the drug was injected. At that time, Dr. Miller noted no side effects, but not all of the side effects would be evident within the 35-minute period.

Officer Steele testified that when the defendant returned from the hospital he was placed in his cell naked so that he could not try to hang himself again. According to Officer Steele, there was a noticeable change in the defendant after he received the injection. Defendant had been very upset, angry, and hostile. After the injection, he was calmer, quieter, and more cooperative.

Defendant was again questioned by the police shortly after midnight. Officers Ryan and Kretsinger were present. Defendant was advised of his rights and indicated that he understood them. He first told Detective Ryan that on the night Warren Hopkins had stayed in his apartment, Warren had slept with the three girls in the bedroom, and defendant had slept on the couch. Later in the interview, however, defendant said that he slept in the bedroom with Warren and that he had been drinking a little bit. He also stated that he grabbed Warren's penis. He denied that there was ever any penetration. Detective Ryan said that defendant did not appear to be abnormal in any way at this time. He had been told that the defendant had been given an injection but not that defendant had been given a mood-altering drug. He was also aware that defendant had denied the charges in the previous interview.

Officer Kretsinger testified that he read defendant his rights and

allowed the defendant to read the rights form. He said that defendant signed the rights form twice, once each time he was interviewed. According to the officer, the first signature was more legible than the second. Kretsinger did not know that the defendant had been previously tranquilized.

Defendant stated that he was interviewed about 8 p.m. by Detective Glick. In this interview, defendant denied that he had committed indecent liberties with a child. After being put in a cell, defendant "just felt I didn't want to go through with it anymore." He then tried to hang himself. Later, at the hospital, defendant was given a shot without his permission. Before the injection, he felt depressed and angry. After the injection, he felt as though he were "high." Defendant said he then felt sleepy, but vaguely remembered leaving the hospital and being put into a car. He next remembered waking up in the county jail. He did not remember making the second signature on the rights form or talking with Officers Kretsinger and Ryan.

The court denied defendant's motion to suppress.

A bench trial took place on September 28, 1979. Just prior to trial, the State's motion to amend the indecent liberties count of the information, to allege that Warren Hopkins was "a child under the age of sixteen years," was granted over defense objection.

The victim's mother testified that Warren had spent the night at defendant's apartment on June 12 or 13, 1979. When defendant brought Warren home the next morning, Warren appeared to be in good physical and mental health. About five weeks later, Warren told his mother of the incident. She then spoke to a police officer and took Warren to a doctor.

Warren Hopkins testified that he was eight years old and in the second grade. When he was questioned to determine his competency, he stated that he knew the difference between the truth and a lie. He described a lie as "a sin." He defined a sin as "something God don't like." The court found Warren competent to testify.

Warren stated that he stayed at defendant's apartment one night. Defendant's sister and daughter were also there. Warren slept in defendant's bed and when asked what the defendant had done to him; Warren said, "He stuck his penis in my butt. And he made me feel his penis and he felt mine." Warren told his mother about this, but not right away. He did not know why he had not told anyone earlier. He also said that he had heard about this happening to someone else "a long time ago." He did not remember who had told him about this type of incident, but he heard about it before he stayed at defendant's apartment.

Officer Ryan then testified concerning defendant's oral statements over a defense objection.

Defendant's sister testified that Warren had come to the defendant's apartment sometime in June. She, Warren, and defendant's daughter had stayed in the bedroom while defendant slept on the couch. In the morning, Warren was still in bed and defendant was on the couch. She denied telling the police that defendant had slept with Lowanda, his girlfriend, while she slept on the couch and Warren and defendant's daughter slept on the living room floor.

The defendant testified substantially the same as at the hearing on the motion to suppress. The State requested the court to take judicial notice of the defendant's testimony at the suppression hearing and the court granted the request over a defense objection.

On rebuttal, Detective Glick testified that on July 20, 1979, at the Decatur Police Department, defendant's sister told him that when Warren stayed over, defendant had slept with Lowanda Page. Defendant's sister and the children had slept in the living room.

# I

Defendant initially contends that his confession was involuntary and should have been suppressed because he was interrogated two hours after being injected with a tranquilizer. He correctly notes that an involuntary confession may not be used to obtain a criminal conviction. *Jackson v. Denno* (1964), 378 U.S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774.

On a motion to suppress a confession, section 114—11 of the Code of Criminal Procedure of 1963 directs:

"The burden of going forward with the evidence and the burden of proving that a confession was voluntary shall be on the State." (Ill. Rev. Stat. 1979, ch. 38, par. 114—11(d).)

The defendant claims that the State did not meet this burden.

Whether a particular statement was voluntarily given must be determined from the totality of the circumstances. (*People v. Simmons* (1975), 60 Ill. 2d 173, 326 N.E.2d 383.) It is initially the task of the trial court to determine what effect the drug may have had at the time the statement was given, along with all other attendant circumstances. (*People v. Koesterer* (1976), 44 Ill. App. 3d 468, 358 N.E.2d 295.) The question for this court to consider is whether the trial court's decision was against the manifest weight of the evidence. *People v. Jones* (1978), 65 Ill. App. 3d 1033, 383 N.E.2d 239.

■■ The mere fact that the defendant had taken or was administered a drug prior to questioning is not—standing alone—sufficient to render a confession involuntary. (See, *e.g., People v. Muniz* (1964), 31 Ill. 2d 130, 198 N.E.2d 855; *People v. Harris* (1979), 69 Ill. App. 3d 91, 386 N.E.2d 933; *People v. McKinnie* (1974), 18 Ill. App. 3d 1012, 310 N.E.2d 507; *People v.*

*Pote* (1972), 5 Ill. App. 3d 856, 284 N.E.2d 366.) The crucial question is whether the defendant's will was overborne. *McKinnie.*

We hold that the trial court's decision—that the confession was voluntary and that the defendant's will was not overborne—is not against the manifest weight of the evidence. We reach this decision based upon the entirety of the facts available to the trial court.

We find particularly significant the fact that the primary effect of the drug administered to the defendant is that it reduces a person's anger and makes him more rational. Although there were various side effects associated with the drug, in their absence, the user may perform such routine tasks as going to work and driving a car. Here, the interrogating officers stated they did not notice the presence of any side effects in the defendant's behavior. Additionally, Detective Ryan testified that defendant did not appear to be abnormal in any way.

The dissent places a heavy reliance upon the decision in *Townsend v. Sain* (1963), 372 U.S. 293, 9 L. Ed. 2d 770, 83 S. Ct. 745. In actuality, the test used by the Supreme Court there is the same employed here—was the defendant's will overborne? This is a factual question which the trial court decided against the defendant. The *Townsend* case is clearly distinguishable from the instant case. In *Townsend*, the petitioner was given phenobarbital and hyoscine. Hyoscine is the same as scopolamine, familiarly known as "truth serum." The court held that the petitioner had presented sufficient allegations to require an evidentiary hearing on his habeas corpus petition.

The dissent grasps for a slender reed.

## II

The information charging defendant with indecent liberties with a child alleged that defendant:

"* * * committed the offense of INDECENT LIBERTIES WITH A CHILD (CLASS 1 FELONY), in violation of chapter 38, section 11—4 of the Ill. Rev. Stat. 1977, as amended, in that the said defendant being a person of the age of 17 years and upwards, performed a lewd fondling or touching of Warren H. Hopkins with the attempt to arouse or to satisfy the sexual desires of the defendant, * * *."

Prior to trial, the State moved to amend the information to allege that Warren Hopkins was "a child under the age of 16 years." The defendant next contends that the trial court erred in allowing the State to amend the information in this manner.

Section 111—5 of the Code of Criminal Procedure of 1963 provides:

"An indictment, information or complaint which charges the commission of an offense in accordance with Section 111—3 of this

Code shall not be dismissed and may be amended on motion by the State's Attorney or defendant at any time because of formal defects, * * *." Ill. Rev. Stat. 1979, ch. 38, par. 111—5.

■■■ Under this section, only formal defects may be corrected. If the defect is substantive, the amendment is improper. (*People v. Heard* (1970), 47 Ill. 2d 501, 266 N.E.2d 340; *People v. Gray* (1978), 61 Ill. App. 3d 243, 377 N.E.2d 1311.) The defendant argues that the requirement of the child being under the age of 16 is a material element of the offense and, as such, the charge is void for failing to state an offense. Thus, the State reasons that the defect in omitting this element is fundamental, and not formal.

Section 11—4 of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 11—4) provides that any person over the age of 17 years commits indecent liberties with a child when he or she performs a specified act with a child under the age of 16. The original information asserted that defendant committed this offense when he performed a lewd fondling or touching of the victim. It was revealed at the preliminary hearing that Warren Hopkins was eight years old. The instant defect in the information was formal.

### III

Finally, the defendant contends that the trial court did not adequately determine the competency of eight-year-old Warren Hopkins. We disagree.

The court had adequate opportunity to assess the witness' competency and properly determine that he was competent. The court conducted an extensive questioning of Warren concerning his competency. Defendant's central complaint is that the court did not adequately assess the witness' concept of truth.

The witness defined truth as something God likes and a lie as "a sin" which is something God doesn't like. The witness also stated that someone who swears to tell the truth and lies goes to the devil.

■■ It is not age but the degree of intelligence of a child which determines the question of his competency to testify, and if the witness is sufficiently mature to receive correct impressions by his sense, to recollect and narrate intelligently, and to appreciate the moral duty to tell the truth, the witness is competent. (*People v. Ballinger* (1967), 36 Ill. 2d 620, 225 N.E.2d 10, *cert. denied* (1967), 388 U.S. 920, 18 L. Ed. 2d 1366, 87 S. Ct. 2141.) The trial judge's determination that a witness is competent to testify will not be disturbed on review unless there has been an abuse of discretion or a manifest misapprehension of some legal principle. *People v. Davis* (1957), 10 Ill. 2d 430, 140 N.E.2d 675, *cert. denied* (1957), 355 U.S. 820, 2 L. Ed. 2d 35, 78 S. Ct. 25.

██ We conclude that the trial judge did not abuse his discretion and that the evidence available to him through questioning and observation of the witness' abilities was sufficient for the trial court to properly make his determination.

Affirmed.

GREEN, J., concurs.

Mr. JUSTICE CRAVEN, dissenting:

Although the record might support the finding that the defendant's confession was the product of a rational intellect, the record does not support a finding that the defendant's confession was a product of a free will. There is no question that the defendant's will was overborne, and therefore the defendant's confession was involuntary. The confession does not become voluntary merely because it was reliable. (See *Townsend v. Sain* (1963), 372 U.S. 293, 9 L. Ed. 2d 770, 83 S. Ct. 745.) The trial court's finding that the defendant's confession was voluntary was erroneous, and, therefore, I must dissent.

> "[I]t is hardly necessary to state that the question whether a confession was extracted by coercion does not depend simply upon whether the police resorted to the crude tactic of deliberate physical abuse. '[T]he blood of the accused is not the only hallmark of an unconstitutional inquisition.' [Citation.] The question in each case is whether a defendant's will was overborne at the time he confessed. [Citations.] If so, the confession cannot be deemed 'the product of a rational intellect and a free will,' [citation]. In resolving the issue all the circumstances attendant upon the confession must be taken into account. [Citations.]" *Reck v. Pate* (1961), 367 U.S. 433, 440, 6 L. Ed. 2d 948, 953, 81 S. Ct. 1541, 1546.

At the defendant's suppression hearing, it was established that around 7:30 p.m., on the day of his arrest, the defendant was interrogated. The propriety of this interrogation is not in dispute. The defendant was given *Miranda* warnings and signed a "custodial interview advice" form which stated that the defendant had received his *Miranda* rights. The defendant's signature at this time (7:43 p.m.) was legible. The defendant denied being involved in the acts charged.

After the interview, which was conducted by Detective Glick, the defendant tried to kill himself by hanging. He was found coughing and gagging, perhaps unconscious, around 9:20 p.m., by Officer Steele. Defendant was taken to a hospital's emergency room. There defendant was examined by Dr. Miller, who found the defendant to be angry, uncooperative, and upset. Against his wishes, the defendant was given a shot of

Haldol, a major tranquilizer. This mood-altering drug works by blocking adrenalin, thereby blocking or reducing anger. Haldol's maximum effect will occur one to six hours after being administered. The defendant was injected with Haldol at 10:20 p.m. He was sent back to jail 35 minutes later. At that time the defendant had not manifested any side effects, according to Dr. Miller.

According to Officer Steele, the defendant was no longer angry or upset after the injection. Rather, he was calmer, quieter, and more cooperative. The defendant was placed naked in his jail cell so that he could not try to hang himself again.

Shortly after midnight, less than five hours after defendant initially denied involvement, about three hours after his abortive suicide attempt, and less than two hours after he had been injected with Haldol and returned to his cell naked, the defendant was again questioned by the police. Officers Ryan and Kretsinger were present. Neither officer said that they knew that the defendant had been given a mood-altering drug.

The defendant was given his *Miranda* rights. However, the defendant's signature on the "custodial interview advice" form was, at this time (12:09 a.m.), illegible. The signature on the form for the first interrogation before the defendant was injected with Haldol was legible. However, Officer Ryan said the defendant did not appear to be abnormal in any way. The midnight interrogation was not recorded in any manner. The police testified that initially during the interrogation the defendant again denied involvement; however, later he admitted involvement. The defendant testified that after he was injected with Haldol, he felt high and very sleepy. He said he did not remember making the second signature on the rights form or talking with Officers Kretsinger and Ryan.

At the end of the suppression hearing, the trial judge stated:

"The evidence as I see it is undisputed that the interview in question, the defendant was still able to resist involvement, he was still able to set up defenses, still aware of the charges, still aware of how to avoid and minimizes the allegations. I do not think that he was reduced to one without will, without knowledge, without decision.

So I am going to show the motion to suppress all of the evidence is denied. I think he knew what was going on and was able to make a voluntary statement."

The trial court seemed to equate knowing what was going on and being able to set up defenses with making a voluntary statement and not having one's will overborne. This logic would be legally acceptable if the only value protected by the prohibition against involuntary confessions was the assurance of reliable confessions. But the value of assuring reliabil-

ity is not the only value our American civilization seeks to protect by prohibiting involuntary confessions. The United States Supreme Court in *Jackson v. Denno* (1964), 378 U.S. 368, 385-86, 12 L. Ed. 2d 908, 921, 84 S. Ct. 1774, 1785, stated:

> "It is now inescapably clear that the Fourteenth Amendment forbids the use of involuntary confessions not only because of the probable unreliability of confessions that are obtained in a manner deemed coercive, but also because of the 'strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will.' [citation], and because of 'the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.'"

Admittedly, this is not a confession that was produced by crude or barbaric tactics. Indeed, the efforts of the police in securing medical aid for the defendant after his attempted suicide were salutatory. However, once the defendant was administered a drug that is correctly referred to as mood-altering, the police should not have interrogated the defendant, especially during the peak of its effect. The fine line that the majority implicitly draws between administering a mood-altering drug and overbearing an individual's will is one that I would not draw for policy, as well as legal, reasons.

In *Townsend*, the court held that the defendant's petition for habeas corpus alleged a deprivation of constitutional rights and that the District Court was required to hold a hearing to ascertain whether the defendant's confession was voluntary. The court stated:

> "It is difficult to imagine a situation in which a confession would be less the product of a free intellect, less voluntary, than when brought about by a drug having the effect of a 'truth serum.' It is not significant that the drug may have been administered and the questions asked by persons unfamiliar with hyoscine's [the drug's] properties as a 'truth serum,' if these properties exist. Any questioning by police officers which *in fact* produces a confession which is not the product of a free intellect renders that confession inadmissible." (372 U.S. 293, 307-09, 9 L. Ed. 2d 770, 782-83, 83 S. Ct. 745, 754.)

*Townsend* indicates that when the police inject the defendant with a mood-altering drug, a resulting confession will be involuntary, even if the effect of the drug assured that the confession was 100 percent reliable.

Moreover, *Townsend* points out that it makes no difference that the interrogating officers do not know that the defendant had been injected

with a drug, or that the drug was administered to the defendant for salutatory reasons. The issue is not the intent of the officer but the will of the defendant.

At the suppression hearing, Dr. Miller read from the Physician's Desk Reference the possible side effects of Haldol, which included insomnia, restlessness, anxiety, euphoria, agitation, drowsiness, depression, lethargy, headache, confusion, vertigo, and grand mal seizures. Ostensibly, the majority places great weight on the fact that the interrogating officers did not notice any side effects in the defendant's behavior. However, there was no evidence presented at the suppression hearing that showed that the police officers were capable of observing any of these side effects. Also, the defendant's second signature on the *Miranda* waiver rights form had deteriorated to illegibility since the time he had signed the form before injected with Haldol.

At any rate, even if there weren't any side effects, this does not mean that the defendant's will was not overborne. The fact remains that the defendant, while in the State's control, was administered a mood-altering drug. Apparently, the defendant was an angry and upset man before the injection of Haldol. He had just tried to kill himself. After the injection took effect by blocking the defendant's adrenalin flow, the defendant became calm and cooperative. He admitted involvement, which he had denied four or five hours before. In short, the defendant's mood was altered by the drug he received. I am disturbed that the majority does not think that the American concept of due process prevents the State from interrogating its citizens while under the influence of a mood-altering drug.

The cases relied on by the majority are so factually dissimilar from our facts that they lend little support to the majority's lame conclusion that the trial court's judgment was not against the manifest weight of the evidence.

The majority cites *People v. McKinnie* (1974), 18 Ill. App. 3d 1012, 310 N.E.2d 507, for the following proposition: "The mere fact that the defendant had taken or was administered a drug prior to questioning is not—standing alone—sufficient to render a confession involuntary. [Citations.] The crucial question is whether the defendant's will was overborne." In *McKinnie*, the only reason that the issue of voluntariness was even discussed was because the defendant was arguing that his trial counsel was incompetent because counsel had not moved to suppress a certain statement defendant made to police. That statement allegedly was made under the influence of drugs, and, at trial, it was used to impair the defendant's credibility.

McKinnie told the trial court in the presence of his attorney that the statement was made freely and voluntarily. However, the court went on in a gratuitous discussion to state that on review of the record it was of the

opinion that the statement would not have been suppressed anyway. Of course, this review was totally speculative because there never was a suppression hearing. Moreover, there was no testimony that the narcotic and tranquilizer given to McKinnie for the express purpose of killing his pain from a gunshot wound had any mood-altering effects. There was no medical testimony that the tranquilizer used on McKinnie was a major tranquilizer, unlike the tranquilizer used on the defendant here. Finally, the court in *McKinnie* concluded that there was no showing that the drug affected McKinnie's mental processes. In contradistinction, in this case, Dr. Miller explicitly stated that Haldol would have the effect of making the defendant "think more logically."

The majority also relies on *People v. Harris* (1979), 69 Ill. App. 3d 91, 386 N.E.2d 933. However, in *Harris*, the defendant contradicted his own statements that he was intoxicated, and the case is further distinguished by the fact that the defendant in *Harris* was not administered drugs while he was in police custody. In short, the court in *Harris*, as the court in *Jones*, another case cited by the majority, found that the defendant's confession was voluntary because he was not intoxicated. Here, of course, there is no question that, in fact, the defendant was under the influence of drugs.

For the foregoing reasons, the State did not meet its burden of proving that the confession was voluntary. Unlike the defendants in *Harris* and *Jones*, the defendant here was under the influence of a drug administered by or on behalf of the government; and, unlike *McKinnie*, the drug given to the defendant here was shown to be a mood-altering drug. Therefore, as a matter of law, I think that the defendant's will was overborne. His confession was not the product of a free will.