(No. 54085.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. FRANK LOUIS KINCAID, Appellant.

*Opinion filed November 20, 1981.*

108

Daniel D. Yuhas, Deputy Defender, and Janet Sinder, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Tyrone C. Fahner, Attorney General, of Springfield, and Basil G. Greanias, State's Attorney, of Decatur (Melbourne A. Noel, Jr., and M. Anita Donath, Assistant Attorneys General, of Chicago), for the People.

MR. JUSTICE CLARK delivered the opinion of the court:

The defendant, Frank Louis Kincaid, was charged in a two-count information with indecent liberties with a child (Ill. Rev. Stat. 1977, ch. 38, par. 11—4) and contributing to the sexual delinquency of a child (Ill. Rev. Stat. 1977, ch. 38, par. 11—5). He was convicted of indecent liberties with a child after a bench trial in the circuit court of Macon County. The second count merged into the first. The appellate court affirmed, with one justice dissenting. (87 Ill. App. 3d 552.) We allowed the defendant's petition for leave to appeal (73 Ill. 2d R. 315).

On the night of his arrest, July 20, 1979, the defendant made an inculpatory statement to the police during questioning. At the hearing on a motion to suppress the statement, which motion was denied, and later at trial, the following facts were produced.

The defendant was arrested at approximately 7 p.m. on July 20, 1979. After signing a *Miranda* rights waiver form, the defendant was interviewed at approximately 8 p.m. by Detective Roy Glick of the Decatur police department. At that time the defendant denied that he had committed indecent liberties with a child. The defendant maintained

he had been at work on June 12, 1979, the night in question. The defendant was then placed in a cell at the Decatur city jail. He tried to speak to a police employee passing by the cell, but the employee refused to speak to him. The defendant then attempted to hang himself, using his shirt and tying one end around his neck and the other end to one of the bars in the cell. A police officer discovered the defendant choking and gagging on the floor of the cell. The officer cut the shirt with a knife. The defendant was then taken to a hospital where, after he acted in an unruly manner to the point of biting a thermometer in half, he was injected with five milligrams of Haldol, a major tranquilizer. The injection occurred at approximately 10:20 p.m. The attending physician, Dr. John Miller, released the defendant at 10:55 p.m. When he was returned to jail, the defendant was placed naked in a cell in order to prevent any further suicide attempts. Thereafter, Detective Glick told two other officers, Clifford Kretsinger and Richard Ryan, that the defendant would need to be questioned again because Detective Glick had discovered that the defendant had not been at work on the night of the alleged offense, as he had originally informed Detective Glick. Before Officers Kretsinger and Ryan questioned the defendant, he again signed a *Miranda* rights waiver form and initialed each paragraph on the form. The defendant's surname in the second signature is not as legible as in the signature he wrote during the initial interrogation. Detectives Kretsinger and Ryan then questioned the defendant again.

Officer Ryan testified during the hearing on the motion to suppress that the defendant stated he knew the alleged victim's family because they lived near his mother's apartment. He then said that he remembered spending the night with the alleged victim during the first part of June. According to the defendant, also present that evening were his sister, Jackie, Wanda Page, defendant's girlfriend, and

114

defendant's daughter. The defendant initially stated that the eight-year-old alleged victim and the three females slept together in one bedroom in the only bed in the apartment, while he slept on the couch. Later in the interview with the two officers, defendant stated that he had been seeing a psychiatrist but had stopped seeing him approximately two months before. The defendant went on to explain that the first part of what he told the officers concerning who was present was true, but that the second bedroom had also been furnished with a bed on June 12, 1979, and that he slept in that room with the alleged victim. According to Officer Ryan, the defendant said that he had been drinking and "that he did grab [the alleged victim's] penis and hunch him, with the front of [defendant's] pants open." Defendant, at that time, denied that there was ever any penetration or that defendant had had any kind of contact that evening.

Officer Kretsinger also testified at the hearing. His testimony corroborates Officer Ryan's:

"Later in the interview he [the defendant] said that wasn't the right sleeping arrangement. He said that the three girls did sleep in one of the bedrooms, that he and the boy slept in the other bedroom in a bed. He said that after they were in bed for a while, he said he started hunching on the boy. He was asked to explain this in a little more detail. He said that his pants were on but open from the waist to crouch [sic]. He said that he did reach over and reached inside the boy's pants and touched the boy's penis. He said that the boy's pants did remain on. He said that later he rolled over on top of the boy and began a hunching motion, this lasted for a few minutes and then he realized what he was doing was wrong, so he got off and apologized to the boy. Then he, Mr. Kincaid, left the room, went to the living room and slept on the couch.

Q. During the first part of the interview did he deny to you any sexual contact with the boy?

A. Yes.

Q. Then later he changed his story and admitted it?

A. That's correct.

Q. During the interview was Mr. Kincaid sleepy or drowsy or nodding off?

A. No.

Q. Did he appear abnormal to you in any way?

A. No.

Q. At any time did he vomit or regurgitate or complain of an upset stomach?

A. No."

The defendant testified at the hearing on the motion to suppress that prior to his arrest on July 20, 1979, he took 15 erythromycin capsules to relieve a bronchitis condition.

The defendant also testified that prior to receiving the Haldol injection he was depressed and angry. Afterward, he felt as though he were "high" and sleepy. He said he was unable to remember giving any statement to the police and, though he did not question that it was his signature on the rights-waiver form, he did not remember signing the form.

Dr. John Miller testified on direct examination at the hearing that the only side effect consumption of 15 erythromycin pills would cause would be an upset stomach. Dr. Miller also testified that Haldol is a major tranquilizer designed to reduce anger by blocking adrenalin. Dr. Miller also said that Haldol would improve a person's ability to think because it would tend to calm a person and help a person to think and act more rationally. Dr. Miller also stated that the maximum effect of the drug could be expected to occur between one and six hours after injection. The defendant made the statement herein approximately one hour and 50 minutes after injection.

During cross-examination by defense counsel, Dr. Miller read from the Physician's Desk Reference some of the adverse reactions associated with Haldol, which is also identified by the generic name of holoperidol. These in-

clude: "insomnia, restlessness, anxiety, euphoria, agitation, drowsiness, depression, *** lethargy, headaches, confusion, vertigo, grand mal seizures and cardiovascular effects to the tachycardia, and low blood pressure."

The trial court denied the motion to suppress, stating:

"The question arises only as to this matter of Dr. Miller giving him a tranquilizer at the hospital earlier in order to restrain him. The evidence as I see it is undisputed that the interview in question, the defendant was still able to resist involvement, he was still able to set up defenses, still aware of the charges, still aware of how to avoid and minimizes [sic] the allegations. I do not think he was reduced to one without will, without knowledge, without decision."

When the State sought to elicit defendant's statement during direct examination of Officers Kretsinger and Ryan, during the trial, the defendant objected. The trial court overruled the objection, and the officers testified in virtually the same manner as at the hearing. The only additional pertinent testimony was that Officer Ryan testified that he and Officer Kretsinger were aware the defendant had had "some kind of problems. I don't know that we were specifically told he had a significantly tranquilizing dosage or not." Officer Kretsinger testified he probably would not have interviewed the defendant if he had known he had been given a tranquilizer because he would have been unable to rely on any statement made.

The defendant was convicted on one count of indecent liberties with a child. He was sentenced to five years in prison.

The issue thus presented is whether the trial court properly denied the motion to suppress defendant's statement. The key inquiry concerning the motion to suppress the statement was whether defendant's statement was voluntary. The State bears a heavy burden of establishing that a statement was knowingly, intelligently and voluntarily made. (*Miranda v. Arizona* (1966), 384 U.S. 436, 475, 16 L.

Ed. 2d 694, 724, 86 S. Ct. 1602, 1628; *People v. Brownell* (1980), 79 Ill. 2d 508, 516-17.) The truthfulness or reliability of a confession is irrelevant in determining whether it was voluntarily made. (*Jackson v. Denno* (1964), 378 U.S. 368, 382, 12 L. Ed. 2d 908, 918, 84 S. Ct. 1774, 1783.) The test to determine whether a confession is voluntary is whether the accused's will was overborne at the time he confessed. (*Townsend v. Sain (1963), 372 U.S. 293, 307, 9 L. Ed. 2d 770, 782, 83 S. Ct. 745, 754; Reck v. Pate* (1961), 367 U.S. 433, 440, 6 L. Ed. 2d 948, 953, 81 S. Ct. 1541, 1546.) If so, the confession cannot be deemed the product of a rational intellect and a free will (*Blackburn v. Alabama* (1960), 361 U.S. 199, 208, 4 L. Ed. 2d 242, 249, 80 S. Ct. 274, 280-81.) A confession which is, *in fact,* induced by the administration of a drug, whether the drug is self-administered or otherwise, is involuntary and thus is inadmissible into evidence. (*Townsend v. Sain* (1963), 372 U.S. 293, 307-09, 9 L. Ed. 2d 770, 782-83, 83 S. Ct. 745, 754-55.) A confession obtained in this manner lowers the ability of the accused to resist suggestions, subtle threats, or promises by interrogators. Its practical effect is to overcome the will of the accused. A confession obtained under such circumstances is violative of the due process clause of the fourteenth amendment to the Federal Constitution. The dominant principle underlying the doctrine is that "'*** the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.'" (*Blackburn v. Alabama* (1960), 361 U.S. 199, 207, 4 L. Ed. 2d 242, 248, 80 S. Ct. 274, 280, quoting, *Spano v. New York* (1959), 360 U.S. 315, 320-21, 3 L. Ed. 2d 1265, 1270, 79 S. Ct. 1201, 1205-06.) Whether a confession obtained after a drug has been administered to an accused is voluntary is a question for the trial court to decide upon a motion to suppress the statement. If a trial court finds, as here, that a confession is voluntary, and as

long as the proper legal standard was applied, then, on review, our inquiry is limited to whether that finding is contrary to the manifest weight of the evidence. *People v. Brownell* (1980), 79 Ill. 2d 508, 521; *People v. Aldridge* (1980), 79 Ill. 2d 87, 93.

In *Townsend v. Sain* (1963), 372 U.S. 293, 9 L. Ed. 2d 770, 83 S. Ct. 745, the Supreme Court of the United States reversed a decision by this court in which, after the accused had repeatedly been injected with a combined dosage of phenobarbital and scopolamine, commonly known as "truth serum," he made confessions, first to the police and State's Attorney and, later, while testifying at a coroner's inquest. The cause reached the Supreme Court on a *habeas corpus* petition filed in Federal district court. The Supreme Court concluded that there was error when, in denying the defendant's motion to suppress prior to trial, the trial judge offered "no indicia which would indicate whether the trial judge applied the proper standard of federal law in ruling upon the admissibility of the confession." Moreover the court stated that this court's opinion "rendered at the time of direct appeal contains statements which might indicate that the court thought the confession was admissible if it satisfied the 'coherency' standard. Under that test the confession would be admissible '[s]o long as the accused [was] *** capable of making a narrative of past events or of stating his own participation in the crime . . . .' 11 Ill. 2d, at 43, 141 N.E.2d, at 736. As we have indicated in Part I of this opinion, this test is not the proper one. Possibly the state trial judge believed that the admissibility of allegedly drug-induced confessions was to be judged by the 'coherency' standard. However, even if this possibility could be eliminated, and it could be ascertained that correct standards of law were applied, it is still unclear whether the state trial judge would have excluded Townsend's confession as involuntary if he had believed the evidence which Townsend presented at the motion to suppress. The problem which

the trial judge faced was novel and by no means without difficulty. We believe that the Federal District Court could not conclude that the state trial judge admitted the confession because he disbelieved the evidence which would show that it was involuntary. We believe that the findings of fact of the state trier could not be successfully reconstructed. We hold that, for this reason, an evidentiary hearing was compelled." (372 U.S. 293, 320-21, 9 L. Ed. 2d 770, 790, 83 S. Ct. 745, 761.) Further the court considered it to be crucial that during the initial hearing on the motion to suppress, the "indispensable" fact was not revealed that scopolamine, also known as hyoscine, is often characterized as a "truth serum." 372 U.S. 293, 321-22, 9 L. Ed. 2d 770, 790-91, 83 S. Ct. 745, 761-62.

It should be noted that in both *Townsend* and in a majority of jurisdictions which have considered the issue (see Annot., 69 A.L.R.2d 384 (1960), and later case service), the fact that an accused is under the influence of drugs, self-administered or otherwise, when he makes a confession does not make the confession inadmissible automatically. It is still the province of the trial court to ascertain whether the accused's will was overborne at the time the confession was made.

In the instant case, it is clear the trial judge applied the proper standard for determining the voluntariness of a confession. At the conclusion of the hearing on the motion to suppress, the judge stated: "I do not think he [the defendant] was reduced to one without will, without knowledge, without decision." Moreover, the evidence supports the trial judge's decision and the reason he gave for it. The medical testimony of Dr. Miller established that a person who has consumed 15 capsules of erythromycin will suffer, at worst, an upset stomach. The police officer testified that the defendant at no time complained of, or showed any sign of, suffering from an upset stomach. Also, Dr. Miller testified that while Haldol may cause many side effects,

such as confusion, depression, anxiety, or lethargy, the drug may also act to cause an unruly person to calm down, and to act rationally. Additionally, it seems extremely unlikely that, had the defendant's will been overborne, he would have been able, first, to deny any wrongdoing with the alleged victim, then to admit, in a very limited way, any wrongdoing, and, finally, to insist that once he realized the impropriety of his act, he got up, apologized to the boy, and left the room for the remainder of the night. It is clear that during the time he was making the statement the defendant was attempting to limit its incriminating effect. It is unlikely that a person whose will was overborne would be unable to resist confessing, yet at the same time attempt to mitigate the effect of a confession. Thus, the tenor of defendant's statement is inconsistent with that of one whose will is overborne. While evidence such as the defendant's less legible second signature and the defendant's testimony that he could not remember making a confession support the defendant's assertion that the confession was involuntary, the weight to be accorded to such evidence is, in the first instance, for the trial court to decide. We do not think that such evidence outweighs the evidence indicating that the defendant's will was not overborne. Thus, in viewing, as we must, all the evidence surrounding the making of the confession (*Reck v. Pate* (1961), 367 U.S. 433, 440, 6 L. Ed. 2d 948, 953, 81 S. Ct. 1541, 1546), we conclude that the trial court's decision that the confession was "voluntary is not against the manifest weight of the evidence. The trial court did not err when it denied the motion to suppress.

The defendant also contends that the trial court erred when it allowed the State to amend count I of the information charging indecent liberties with a child to add the element that the alleged victim was under 16 years of age. The information charged that the defendant "committed the offense of INDECENT LIBERTIES WITH A CHILD, (CLASS I FELONY), in violation of Chapter 38, Section

11—4 of the Ill. Rev. Stat., 1977, as amended, in that the said defendant being a person of the age of 17 years and upwards, performed a lewd fondling or touching of [here they named the alleged victim] with the intent to arouse or satisfy the sexual desires of the defendant * * *."

Immediately prior to trial the State moved to amend the information to state that the alleged victim was "a child under the age of sixteen years." The following colloquy occurred:

> "THE COURT: Motion by the People for leave to file amended Count I. Is it amended Count I? Yes.
>
> [DEFENSE COUNSEL]: Objection by the defendant.
>
> THE COURT: Do you want to put anything on the record?
>
> [DEFENSE COUNSEL]: My objection is that the charge as it originally was presented to the Court we [were] prepared to go to trial. And I object to their adding a material element of the offense on the date of trial. I don't think it is— gives us time to prepare. I don't think it is proper to add something on the date of the trial.
>
> THE COURT: Show the objection. Overruled. Leave granted. Amended information on file. If you want additional time within which to prepare you will get it.
>
> [DEFENSE COUNSEL]: I will go ahead."

The State argues that "the People do not deny that the age of the victim is an essential element of the charge but deny that the understatement of the victim's identity is a fundamental defect" and, therefore, the amendment was to cure a formal defect as allowed under section 111—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, par. 111—5). We find this to be a circuitous argument without substance or merit. The age of the victim is an essential element of the crime charged and, as such, must be alleged and proved; otherwise, the judgment rendered

under such information would be void. *People v. Heard* (1970), 47 Ill. 2d 501, 505.

Alternatively, the State contends that the standard for review is the rule announced in *People v. Pujoue* (1975), 61 Ill. 2d 335, and that it should be followed. That rule, however, is applicable only in those instances where the defendant raises the error for the first time on review. Here the defendant raised his objection to the amendment at the trial level, and therefore the rule is inapplicable. See *People v. Lutz* (1978), 73 Ill. 2d 204, and *People v. Strait* (1978), 72 Ill. 2d 503.

Section 111—5 of the Code of Criminal Procedure of 1963 provides:

"Formal Defects in a Charge. An indictment, information or complaint which charges the commission of an offense in accordance with Section 111—3 of this Code shall not be dismissed and may be amended on motion by the State's Attorney or defendant at any time because of formal defects, including:

(a) Any miswriting, misspelling or grammatical error;

(b) Any misjoinder of the parties defendant;

(c) Any misjoinder of the offense charged;

(d) The presence of any unnecessary allegation;

(e) The failure to negative any exception, any excuse or provision contained in the statute defining the offense;

or

(f) The use of alternative or disjunctive allegations as to the acts, means, intents or results charged." (Ill. Rev. Stat. 1977, ch. 38, par. 111—5.)

It is defendant's position that defects allowed to be corrected under this section are limited to formal rather than fundamental defects; that here the amendment corrected a fundamental defect; and, therefore, under *People v. Heard* (1970), 47 Ill. 2d 501, 505, the original information was void

and not subject to amendment under the section. We disagree.

Defendant's reliance on *Heard* is misplaced. There the defendant was tried and convicted under a charge found to be void in that the complaint failed to set forth the offense "with the specificity required under the United States and Illinois constitutions and under our Code of Criminal Procedure." (47 Ill. 2d 501, 504.) Here, prior to trial and conviction, the amended information contained all of the necessary allegations of the offense charged.

The issue to be resolved is whether an information can be amended prior to trial to include the essential elements of the offense charged.

Section 111—5 is drawn in mandatory language; *i.e.*, a list of examples as to when a charge shall not be dismissed but may be amended. It should be noted that the list is not intended to be exclusive. (*People v. Jones* (1973), 53 Ill. 2d 460, 462.) Conversely, the section fails to list when a charge may not be amended. Our research has not revealed any other statute which would abrogate the common law right of the State to amend its information.

At common law, the State was permitted to amend informations. (*People v. Fensky* (1921), 297 Ill. 440, 442.) Over a century ago this court addressed the issue when, quoting from Lord Mansfield, it stated:

" 'There is a great difference between amending *indictments* and amending *informations*. Indictments are found upon the oaths of a jury, and ought only to be amended by themselves; but informations are as declarations in the King's suit. An officer of the Crown has the right of framing them originally, and may, with leave, amend in like manner as any plaintiff may do. If the amendment can give occasion to a *new defense,* the defendant has leave to change his plea; if it can make no alteration as to the defense, he does not want it.' " (Emphasis in original.) (*Truitt v. People* (1878), 88 Ill. 518, 520.)

(See also *Long v. People* (1890), 135 Ill. 435, 441.) What was said in 1878 is valid today.

Under the liberalization of criminal pleadings, we have retained certain of the common law basic principles under the present code of criminal procedure. All felonies shall be commenced by information or indictment, and no prosecution by information may proceed unless a preliminary hearing has been held or waived. (Ill. Rev. Stat. 1977, ch. 38, par. 111—2.) Further, an indictment is to be signed by the foreman of the grand jury; an information is to be signed by the State's Attorney and sworn to by him or another. Ill. Rev. Stat. 1977, ch. 38, par. 111—3.

With reference to amending of indictments, a unanimous Supreme Court in *Stirone v. United States* (1960), 361 U.S. 212, 215-17, 4 L. Ed. 2d 252, 256, 80 S. Ct. 270, 272-73, stated: "Ever since *Ex parte Bain* [(1887), 121 U.S. 1, 30 L. Ed. 849, 7 S. Ct. 781] was decided in 1887 it has been the rule that after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." In *Bain* the court said that "[a]ny other doctrine would place the rights of the citizen, which were intended to be protected by the constitutional provision, at the mercy or control of the court or prosecuting attorney." (121 U.S. 1, 13, 30 L. Ed. 849, 853, 7 S. Ct. 781, 787-88.) This conforms with the statutory provision that an indictment "shall be signed by the foreman of the Grand Jury" (Ill. Rev. Stat. 1977, ch. 38, par. 111—3) and, therefore, impliedly requires that any amendment to an indictment must originate with the grand jury.

On the other hand an information originates with the State's Attorney. As a practical matter, under present procedure, the State could accomplish results similar to amendment. The State's Attorney has a right, with leave of court under certain conditions, to dismiss any charge, including a faulty information. Then, at the time of dismissal, he may file, in open court, a new complaint which would include

any missing essential elements not alleged in the original information. By doing so, the complaint would constitute a new case and the criminal process would commence anew. Defendant would immediately be taken into custody, a new appearance bond would be set, and a preliminary hearing would be scheduled followed by a new information being filed. Generally speaking, defendants' rights would not be prejudiced by this type of action; however, the necessity for such procedure results in an expensive and inefficient method in attaining a result that could be accomplished more directly were the State's Attorney allowed to amend his information. In addition, the obvious disadvantages incurred by the defendant, as set out above, would be eliminated.

A better procedure would be to allow the State's Attorney to amend an information to include essential elements of the crime charged only when such amendment is made before trial, a prompt preliminary hearing is held to determine probable cause, and the defendant is allowed to plead anew and is afforded a reasonable time to further prepare his defense, which time shall be attributable to the State for the computation of time under section 103—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, par. 103—5). The date of such an amendment would be considered as the commencement of the original charge for the purposes of sections 3—5 through 3—8 of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, pars. 3—5 through 3—8). The trial court could also impose additional conditions that are necessary to insure the protection of the defendant's rights.

In summation, as applicable to the instant case, we find that the State, under the common law, had a right to amend count I of the information, that this was accomplished prior to trial, that there had already been a prompt preliminary hearing to determine probable cause, at which hearing the age of the victim was indicated (making it unnecessary to

again hold a preliminary hearing following the filing of the amended information), and that the court offered the defendant "additional time within which to prepare" but the offer was refused. ·

Our review of the record discloses that the amendment to the information and the commencement of trial upon the amendment were both accomplished within the time re-quired by sections 3—5 through 3—8 of the Criminal Code of 1961 and section 103—5 of the Code of Criminal Procedure of 1963.

For these reasons, the judgment of the appellate court is affirmed.

*Judgment affirmed.*

MR. JUSTICE SIMON, dissenting:

I believe that this case was correctly appraised in the appellate court dissent of Justice Craven: "Although the record might support the finding that the defendant's confession was the product of a rational intellect, the record does not support a finding that the defendant's confession was a product of a free will." (87 Ill. App. 3d 552, 559.) The majority here has committed the same error as the trial court. It confuses the product of a rational mind with the product of a free will and consequently has applied an improper test of voluntariness. The confession, correctly viewed, was not voluntarily given and therefore fundamental due process required that it be suppressed.

It has long been settled that an involuntary confession is inadmissible. (For the common law antecedents of the constitutional rule, see *Bram v. United States* (1897), 168 U.S. 532, 42 L. Ed. 568, 18 S. Ct. 183.) The fifth amendment's ban on compelling defendants to be witnesses against themselves has been viewed as embracing all forms of compulsion, both physical and mental. Because the courts realized that the ingenuity of zealous interrogators would usually outstrip judicial formulations of the coercive de-

vices that were banned, the focus in determining if confessions were voluntarily obtained was shifted from the tools that produced the confessions to the effects defendants' circumstances had on their minds. (*Bram v. United States* (1897), 168 U.S. 532, 548, 42 L. Ed. 568, 575, 18 S. Ct. 183, 189.) Thus, the court was asked to determine if the confession was made freely, voluntarily, and without inducement of any sort. *Wilson v. United States* (1896), 162 U.S. 613, 623, 40 L. Ed. 1090, 1096, 16 S. Ct. 895, 899.

Similar tests have been formulated under the fourteenth amendment's guarantee of due process. (*Brown v. Mississippi* (1936), 297 U.S. 278, 285, 80 L. Ed. 682, 687, 56 S. Ct. 461, 465 ("Because a State may dispense with a jury trial, it does not follow that it may substitute trial by ordeal").) The question is whether the defendant's confession was voluntary; there is no *per se* rule, but instead a case-by-case analysis of the totality of the circumstances is employed, and the truth or falsity of the confession cannot influence that determination. (*Jackson v. Denno* (1964), 378 U.S. 368, 377, 12 L. Ed. 2d 908, 916, 84 S. Ct. 1774, 1781.) A voluntary confession must be the product of a free and rational choice (*Mincey v. Arizona* (1978), 437 U.S. 385, 401, 57 L. Ed. 2d 290, 306, 98 S. Ct. 2408, 2418; *Greenwald v. Wisconsin* (1968), 390 U.S. 519, 20 L. Ed. 2d 77, 88 S. Ct. 1152); put another way, it must be the product of a rational intellect and a free will (*Blackburn v. Alabama* (1960), 361 U.S. 199, 208, 4 L. Ed. 2d 242, 249, 80 S. Ct. 274, 280-81).

The distinction between an intellect that is rational and a will that is free must not be blurred. It is possible to have one without the other, but both are necessary for a statement to be voluntary. For example, one operating under insane delusions, as in *Blackburn v. Alabama,* may freely choose, without any external compulsion, to confess participation in a crime in great detail. The defendant may seem to give "sensible" answers to questioning. But the mental disease afflicting the defendant robs the defendant of any

rational choice. Although there is volition, it cannot be said that there is any "meaningful volition." Thus, the confession must be suppressed. (*Blackburn v. Alabama* (1960), 361 U.S. 199, 211, 4 L. Ed. 2d 242, 250, 80 S. Ct. 274, 282.) On the other hand, a defendant being tortured on the rack or under more modern third-degree methods may be perfectly rational, concise and consistent in confessing. It is even readily believable that a defendant would try to hedge a confession under such pressures, in order to say as little damning as possible while avoiding harsher physical or psychological pain. (See *e.g., Mincey v. Arizona* (1978), 437 U.S. 385, 57 L. Ed. 2d 290, 98 S. Ct. 2408.) But a rational confession of that type lacks free will. It too must be suppressed.

With this understanding of what is voluntary, I turn to the circumstances of this case—a confession obtained while the defendant was in police custody, stripped naked and under the influence of the mood-altering drug Haldol. Unlike the experience in some other countries, our police do not normally receive confessions induced by involuntarily administered drugs, and so the case law governing the admissibility of such confessions is meager. In *People v. Heirens* (1954), 4 Ill. 2d 131, 141, this court expressed its belief that a confession induced by the unauthorized use of sodium pentothal was a flagrant violation of defendants' rights and any conviction obtained from such a confession could not stand. In *People v. Muniz* (1964), 31 Ill. 2d 130, 138, there was no evidence to support the defendant's claim that materials he had swallowed would tend to affect his confession. In *People v. Townsend* (1957), 11 Ill. 2d 30, 37, a divided court held that a confession obtained after the defendant was injected with hyoscine (which the majority opinion in this case notes is also known as scopolamine and often characterized as a truth serum) could be admitted at trial because the confession was so coherent that the defendant's "performance in making it was incompatible with a

mind devoid of discernment or of a will of its own." The court analogized to confessions obtained while the defendant was intoxicated, which are admissible if the defendant "is capable of making a narrative of past events or of stating his own participation in the crime." 11 Ill. 2d 30, 43.

The *Townsend* analysis was faulty in two respects. First, the diminished capacity of one who brings on his own drunken condition does not render acts involuntary. (See Ill. Rev. Stat. 1979, ch. 38, par. 6—3.) This should be contrasted with the defendant who is drugged by police without consent. As Mr. Justice Schaefer noted in dissenting in *Townsend,* none of the cases the majority relied upon in that case involved intoxication induced by the police. (11 Ill. 2d 30, 49.) Second, the "coherence" test for voluntariness addresses only the question of whether the defendant was operating rationally. It does nothing to assure that the confession was the product of a free will.

*Townsend* was reversed in *Townsend v. Sain* (1963), 372 U.S. 293, 9 L. Ed. 2d 770, 83 S. Ct. 745. The court focused on the medical effects of the drugs given to the defendant, noting that they would pacify and quiet him. The court rejected the "coherence" test and said that it was difficult to imagine a situation in which a confession was less the product of a free intellect, less voluntary, than when the defendant was given a truth serum whose general property was to debilitate the defendant's power of resistance. 372 U.S. 293, 307-08, 322, 9 L. Ed. 2d 770, 782, 791, 83 S. Ct. 745, 754.

A scopolomine injection was also examined in *Jackson v. Denno* (1964), 378 U.S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774, but there the court remanded the case for a determination of whether the drugs administered to the defendant had had a chance to take effect. In *Beecher v. Alabama* (1967), 389 U.S. 35, 19 L. Ed. 2d 35, 88 S. Ct. 189; (1972), 408 U.S. 234, 33 L. Ed. 2d 317, 92 S. Ct. 2282, the court suppressed two confessions obtained after the defendant,

who had been seriously wounded in a gunfight with police and then threatened with immediate execution if he did not talk, was given morphine in the hospital. The drug took the pain away and relaxed the defendant, who said it made him want to love somebody. The court said that the circumstances made it clear the confessions were not voluntary. See also, *e.g.*, *State v. Allies* (1979), ___ Mont. ___, 606 P.2d 1043 (confession induced by sodium amytal held involuntary); *State v. Linn* (1969), 93 Idaho 430, 462 P.2d 729 (exculpatory statement induced by sodium amytal held inadmissible because unreliable); *State v. Jones* (1954), 73 Wyo. 122, 276 P.2d 445 (confession held involuntary after Demerol was given to calm the hysterical defendant); *Edwardson v. State* (1951), 225 Ala. 246, 51 So. 2d 233 (confession obtained after narcotics administered to kill pain held involuntary); *State v. Graffam* (1943), 202 La. 869, 13 So. 2d 249 (confession obtained after morphine administered to kill pain held involuntary).

From these drug-induced confession cases has come the principle that the defendant's will may not be overborne by the effects of injected drugs at the time of the confession. (*Townsend v. Sain* (1963), 372 U.S. 293, 307, 9 L. Ed. 2d 770, 782, 83 S. Ct. 745, 754.) A review of the effects of the drug Haldol in general and the circumstances of this defendant before and after the injection reveals that this was precisely what happened to Kincaid. Haldol is a mood-altering drug which blocks the body's first line of hormonal defense by neutralizing the adrenalin released into the blood stream at times of physical or emotional stress. It calms people, allowing them to act more rationally. It is clear that, without the Haldol injection, Kincaid was in no mood to act rationally or cooperate with police. Kincaid denied involvement in the crime when interrogated after his arrest; then, when left alone in his cell, his patience was exhausted and he tried to hang himself. Taken to a hospital, he was angry, upset and extremely uncooperative. The

treating physician said he gave Kincaid an injection of 5 milligrams of Haldol at 10:20 p.m. "because of his extreme anger and restlessness in an attempt to reduce some of his angry feelings so that he could be dealt with more easily." Kincaid was returned to his cell and stripped naked.

After the injection, Kincaid appeared calmer and quieter to those who had seen him before. The police officer in charge of the prisoner said that Kincaid was more cooperative. Almost 2 hours after the injection, at 12:09 in the morning, when the effect of the drug was at its maximum, Kincaid was again interrogated. He signed a waiver of rights form, but his signature had become almost illegible. At this time Kincaid made his confession. Kincaid's later recollection of his arrest and questioning was limited. He remembered waking and being taken to the hospital. He was depressed and angry there, but after the injection his mood switched; he felt sleepy and high. Kincaid did not recall talking to police officers after his return to the jail.

Considering merely the effect of the Haldol on the admissibility of the confession, I believe the confession must be suppressed. Unlike *Jackson v. Denno,* the injection was given plenty of time to take effect. Before the injection Kincaid not only denied his involvement, he sought, through suicide, eternal refuge from any further discussion of his conduct. After the injection, cooperation was pharmacologically forced upon him, as in *Beecher v. Alabama,* to the point where he was made "the deluded instrument of his own conviction." That the law of this land and its antecedent has never allowed. (*Bram v. United States* (1897), 168 U.S. 532, 547, 42 L. Ed. 568, 575, 18 S. Ct. 183, 188, *citing* 2 Hawkins' Pleas of the Crown, ch. 46, § 3, n.2 (Leach 6th ed. 1787).) It is ironic that one of the interrogating officers realized what the majority apparently does not accept—that the effect of the drug on Kincaid stripped the confession of all reliability. The officer said that he would not have questioned Kincaid if he had known about the

effect of the drug. This testimony exonerates the officer from any intentional wrongdoing, but does nothing to render Kincaid's statement voluntary.

My belief that this confession was not voluntary hardens into certainty when the other circumstances of Kincaid's treatment are considered. First, Kincaid was in jail, isolated in a hostile environment. Compulsion is inherent in custodial situations. (*Beckwith v. United States* (1976), 425 U.S. 341, 346, 48 L. Ed. 2d 1, 7, 96 S. Ct. 1612, 1616; *Miranda v. Arizona* (1966), 384 U.S. 436, 458, 16 L. Ed. 2d 694, 714, 86 S. Ct. 1602, 1619.) Second, he was stripped naked. Without even going into the physical discomfort inherent in being in a jail cell naked, the humiliation of facing interrogators in that condition was itself psychological compulsion directed at Kincaid. It should be noted that in *Bram* the court emphasized, in finding the defendant's statements to the police involuntary, that he was interrogated after being stripped naked. (*Bram v. United States* (1897), 168 U.S. 532, 561, 42 L. Ed. 568, 580, 18 S. Ct. 183, 194.) "Subtle pressures [citations] may be as telling as coarse and vulgar ones." (*Garrity v. New Jersey* (1967), 385 U.S. 493, 496, 17 L. Ed. 2d 562, 565, 87 S. Ct. 616, 618.) Finally, Kincaid's deteriorated signature indicated that the entire course of events had a physical effect upon him which cannot be overlooked. In *People v. O'Leary* (1970), 45 Ill. 2d 122, 125, the court said that where the defendant because of his obstreperous behavior was tear gassed in his cell, he had brought it on himself. Nevertheless, the court could not escape the conclusion that a confession, only half an hour after the gassing, was involuntary. (45 Ill. 2d 122, 126.) The police and medical procedures here may have been reasonable responses to Kincaid's attempted self-destruction, but they rendered his confession involuntary and inadmissible. The finding that the confession was voluntary was against the manifest weight of the evidence.

Despite lip service to the proper rule of law, the trial

court and the majority have resurrected the *Townsend* coherence test to determine voluntariness, stating that it seems unlikely that had the defendant's will been overborne he would have been able to limit the incriminating effect of his statement. (87 Ill. 2d at 119-20.) Far from unlikely, this effect was in keeping with the medical testimony about Haldol's effects. It enhanced rationality but enervated anger and resistance like the scopolomine in *Townsend*. It proves nothing to discuss the defendant's attempts to dodge the tenor of the interrogators' questions; the real question is whether Kincaid wanted to talk to the interrogators at all. His conduct before the injection was clearly uncooperative; it therefore strains credulity to find that his new-found cooperation within such a short time after the injection was merely a coincidence.

This is not a case involving the well-known "truth serum" sodium pentothal, and to look for that drug's effects here is to blind oneself to the facts of this case. Sodium pentothal attacks both free will and rational intellect; it renders the subject unable to critically survey responses or to associate, select or inhibit the subject's remarks. (*People v. Heirens* (1954), 4 Ill. 2d 131, 135.) The effect of Haldol is more subtle; it attacks only the free will, altering the defendant's mood from a natural state of anger and obstinacy to one of calmness and cooperation. A subject so pacified is undoubtedly more malleable in the hands of questioners, and the use of this drug is at least as efficient a way to break a suspect's spirit as the thumbscrew or rack. Nevertheless, efficiency in law enforcement is no substitute for constitutionality. Our fundamental law forbids the use of involuntary confessions, and that fundamental law was violated here.

The behavior in question is too dangerous and too reminiscent of the type of interrogation we abhor in repressive institutions to rationalize or tolerate it in any way. In my view the conviction must be reversed, the defendant's

134

drug-induced, involuntary statements suppressed, and the case returned to the circuit court for a new trial. I respectfully dissent.