# Illinois Official Reports

## Appellate Court

---

### *People v. Staake*, 2016 IL App (4th) 140638

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JARED M. STAAKE, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-14-0638 |
| Filed<br>Rehearing denied | November 10, 2016<br>December 5, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Schuyler County, No. 13-CF-29; the Hon. Alesia A. McMillen, Judge, presiding. |
| Judgment | Affirmed as modified and remanded with directions. |
| Counsel on Appeal | Michael J. Pelletier, Jacqueline L. Bullard, and Allen H. Andrews (argued), of State Appellate Defender's Office, of Springfield, for appellant.<br><br>Ramon Escapa, State's Attorney, of Rushville (Patrick Delfino, David J. Robinson, and Allison Paige Brooks (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion.<br>Justices Holder White and Appleton concurred in the judgment and opinion. |

**OPINION**

¶ 1    In July 2013, the State charged defendant, Jared M. Staake, with second degree murder for the killing of Michael Box. In December 2013, the State filed an amended information, dropping the charge of second degree murder and adding a charge of first degree murder. In January 2014, the State filed a second amended information, this time charging first degree murder under a different theory. The trial court rejected defendant's objections to the January 2014 charge, and the cause proceeded to trial. After the close of evidence, the court instructed the jury on second degree murder over defendant's objection. The jury found defendant guilty of second degree murder and the court later sentenced him to 18 years in prison. Defendant appeals, raising several issues. We affirm as modified and remand with directions.

¶ 2                                    I. BACKGROUND
¶ 3                                  A. Procedural Matters
¶ 4    In July 2013, the State charged defendant by information with second degree murder (720 ILCS 5/9-2(a)(1) (West 2012)). The information alleged that defendant committed the first degree murder (720 ILCS 5/9-1(a)(1) (West 2012)) of Box while acting under a sudden and intense passion resulting from serious provocation by Box.

¶ 5    In October 2013, defendant disclosed that he intended to assert the affirmative defense of self-defense if the cause proceeded to trial. The trial court scheduled a January 13, 2014, trial date.

¶ 6    On December 2, 2013, the State filed a motion *in limine*, asking the trial court to prohibit defendant from presenting evidence or argument relating to Box's refusal of medical treatment as an intervening cause of death.

¶ 7    That same day, defendant filed a motion *in limine*, seeking to admit evidence of Box's reputation and propensity for violence in support of his self-defense claim. Specifically, defendant sought to introduce the testimony of "several witnesses" who could testify to both specific acts of violence and to Box's reputation for violence. In addition, the motion indicated that defendant anticipated testifying about his knowledge of Box's violent tendencies.

¶ 8    At a December 4 status hearing, the prosecutor explained, "I do realize now that after reviewing, especially the *Lynch* motion [(*People v. Lynch*, 104 Ill. 2d 194, 470 N.E.2d 1018 (1984))] and some of the other items, that there's a self-defense claim, your Honor. And I've done some research, and I feel at this time that it may be imminent that the State may be amending the charge to *** first-degree murder ***. However, that shouldn't change anything, because even in a second-degree murder case, the State still has to prove first-degree murder ***." Defendant, through counsel, responded as follows:

> "And I would like to respond to what was just represented in open court for the first time, that being this transforming into a first-degree homicide case. Your Honor, it was manifestly clear at the preliminary hearing where it was factually established and adduced that [Box] first punched [defendant], and [defendant's] actions were responsive thereto, that we were dealing with a self-defense case. My first disclosure, which was timely filed within 28 days of the receipt of the initial tender of discovery, clearly set forth that self-defense would be raised as an affirmative defense, your Honor. So for this to come as some kind of a surprise to the State, just based upon the

filing of the *Lynch* motion, I think that's disingenuous, your Honor. If the State would within 30 days of trial [*sic*] were to essentially transform a secondary case. And, your Honor, they essentially, for all intents and purposes, charged it as a second-degree event. I have to believe, based on knowing the facts at the time, that this was either responsive to a provocation, a mutual combat situation, but certainly not a first-degree homicide context, for them to now within 30 days of trial transform it into a first-degree homicide cause. I don't know, your Honor, if I could in good faith proceed to trial on 13 January with that little change in the course of the proceeding."

¶ 9 The trial court responded, as follows:

"I don't have any control over the charges the State files, except if they're filed the morning of trial, I probably have some control over that. But under these junctures, I think they have the right to do that. I think you have the right certainly to say there's some surprise there, and I don't know whether I can be ready. I appreciate all of your candor here, because everybody could just play it close to the vest, and I could subpoena all of my jurors, and we could come in here ten days before trial and know that we weren't ready.

* * *

And so I think, [defense counsel], it's just basically up to you whether or not you want to go forward with this case January 13th at this juncture or you know you don't want to do that."

¶ 10 Defense counsel responded as follows:

"You Honor, I have governed my affairs based on the charging instrument and the discovery received to date around trying this case on 13 January. Now, again, your Honor, that's based on the charging instrument that is on file at this point in time. Still having that charging instrument as our notice, and based on all of the discovery I have in fact received to date, I will represent to your Honor I'm fully prepared, willing, and able to start picking a jury on 13 January. But there's two things I don't have control over at this time your Honor, that being the discovery, which is still outstanding, and I do agree with your Honor the State has an absolute right to charge [defendant] differently than they've charged him now, but I state once again with full faith and confidence that my *Lynch* motion did nothing to change the dynamic in this cause as to whether or not we have a first-degree homicide cause or a second-degree homicide cause."

The court then instructed the State to make any amendments to the charging information within the next seven days.

¶ 11 The following day, December 5, 2013, the State filed an amended information. The amended information alleged that defendant committed first degree murder (720 ILCS 5/9-1(a)(1) (West 2012)) by stabbing Box, thereby causing his death, while knowing that the stabbing would cause his death. The amended information no longer charged second degree murder.

¶ 12 On December 18, 2013, the trial court conducted a hearing on the two motions *in limine*. As to the State's motion to prohibit defendant from producing any evidence or argument about an intervening cause of death, defendant argued that causation was an essential element of "the crime" and, as such, was a question of fact for the jury to determine. The court explained that if

defendant planned to challenge the State's evidence of causation, "it has to be raised by evidence, not just by speculation." The court continued, "So, if the defense intends to actually question the State's causation evidence, I think they're entitled to do that, but then they're going to have to come up with, with actual evidence of that, not just their own speculation of what might have happened."

¶ 13 The trial court eventually granted the State's motion. However, the court allowed for the following procedure:

"[I]f the defense has evidence that they wish [*sic*] that's going to actually question the causation evidence, then again through an offer of proof they can, they can introduce that to me outside the presence of the jury, and I'll see if it raises to that. But what I'm not going to let either side do in this case is just raise question marks for the jury with no evidence behind it ***.

***

So the defense response didn't, by affidavit or otherwise, indicate that they had any evidence with regard to causation. And they may. I simply don't know. I don't know if they have a forensic expert as well that's going to question what the State's witnesses have said. But if that's the case, I'm going to need to know about that, and I'm assuming that's going to have been produced in the discovery. But at this juncture, I don't have any of that information. So I'm granting the [State's] motion *in limine*, their first motion *in limine*, that there will not be any questions asked, issues raised about causation, unless the defense has, has actual evidence they're going to produce. And if they do, then I'm going to see that in an offer of proof outside the presence of the jury. *** If the defense has a defense on this or any other issue they wish to raise, they are invited to do that, but it has to be by evidence, not just by a question that's to be speculative."

¶ 14 The trial court then addressed defendant's motion to introduce so-called "*Lynch* evidence"—*i.e.*, evidence of the decedent's (1) reputation and (2) propensity for violence. The court denied defendant's request to introduce evidence of Box's propensity for violence, reasoning that such evidence is relevant only when a question exists as to who was the initial aggressor and that, in this case, there was no question that Box was the initial aggressor.

¶ 15 As to evidence of Box's *reputation* for violence, the trial court determined that defendant had not yet presented any evidence to establish that defendant was aware of any reputation for violence on the part of Box. As a result, the court determined that defendant would not be permitted to introduce evidence of Box's reputation unless and until defendant provided evidence establishing his knowledge of that reputation. The court added the caveat that if defendant wished to make a proffer of evidence—before trial—establishing that he had specific witness testimony showing that defendant had knowledge of Box's reputation for violence, defendant was free to do so. The court again voiced its concern about witnesses testifying to irrelevant evidence before the jury that the court would be required to strike.

¶ 16 The parties and the trial court then addressed whether a preliminary hearing was necessary on the State's amended information. The State explained that it "was unsure as to whether the court would require preliminary hearing since the court has already found there was probable cause as to the second degree murder. And, as the court is well aware, in order to—you have to prove all the elements. And so to prove the elements of second degree murder, the State must first prove first degree murder ***."

¶ 17 The trial court responded, "It's [the court's] belief that once there's a preliminary hearing on any felony matter, there's no requirement there be an additional preliminary hearing on additional or new charges." The court explained that it would not conduct a preliminary hearing unless either party objected. The following exchange between the court and defense counsel then occurred:

"[THE COURT]: Okay then, [defense counsel], are you requesting an additional preliminary hearing?

[DEFENSE COUNSEL]: I am not requesting one, but the defendant does not wish to waive a preliminary hearing if this court were to conduct a preliminary hearing.

[THE COURT]: Okay. Well, I'm not—I'm not asking him to waive preliminary hearing. He didn't. We had a preliminary hearing on this charge. There has been an amended charge filed. If you are requesting an additional preliminary hearing, I will hear that request and make a determination on it. If not, we'll move along.

[DEFENSE COUNSEL]: Just to clarify again, I am not requesting one nor is the defendant waiving his right to a preliminary hearing on the first [degree] murder charge.

[THE COURT]: Well, let's not dance with the words. Are you asking for preliminary hearing on the new charge or not? I did not ask him to waive preliminary hearing. He didn't. We had a preliminary hearing.

[DEFENSE COUNSEL]: No, your honor, I was just referencing the pleading, the preliminary hearing that was noticed up for today.

[THE COURT]: Okay. Then I will understand that I'm going to read the defendant the new charges again, presuming—'cause this was all discussed at our last hearing, so everybody came here with the intention that this was what was going to happen today. I'm not sure if either [defense counsel] was present at our last hearing. I know [other defense counsel] was here and knew, in fact there was some discussion about trial dates with that, knew that there were going to be amended charges filed."

¶ 18 The trial court then informed defendant of the nature of the first degree murder charge and the penalties defendant faced if found guilty. Defendant stated that he understood and persisted in his not guilty plea. Defense counsel then said the following:

"[T]o prove second-degree murder, you basically have to prove first-degree murder first. So this really changes nothing at all as far as our preparation and being ready for trial. All of the evidence is exactly the same as it was when the second-degree murder charge was the pending charge. And just as we answered a few weeks ago that we were ready for trial, we still are ready for trial."

¶ 19 On January 3, 2014, the trial court conducted a hearing on any proffers of evidence that defendant wished to present concerning the motions *in limine*. As to the State's motion to prohibit evidence of an intervening cause of death, defendant first argued that the court should reconsider its decision. Defendant argued that causation was an element of the offense and that he therefore had a constitutional right to cross-examine the State's witnesses (in particular, the medical examiner) on the issue of causation, and he should not first have to present a proffer of what testimony the State's witnesses might provide. Defendant therefore asserted that the court's ruling violated his sixth amendment right to confront witnesses. The court explained that the requirement of a proffer was intended to prevent a "fishing expedition that you know in

- 5 -

advance isn't going to produce any evidence because you know what the medical examiner said." The court denied defendant's motion to reconsider but reminded defendant that he could still submit a proffer of evidence that he expected to extract from the medical examiner.

¶ 20    Defendant, through defense counsel, then made a proffer of *Lynch* evidence to establish that defendant knew about Box's reputation for violence. Counsel explained that one night the previous winter, defendant and Box were in the Freight House Tavern in Beardstown. That night, Box "cold cock[ed]" another patron, knocking him unconscious—an event witnessed by defendant. Defendant then saw Box approach the patron, who was lying unconscious on the ground. Defendant believed that Box intended to kick the victim. Defendant intervened and prevented any further violence. Counsel argued that episode established defendant's personal knowledge of Box's violent tendencies, which was relevant to establish the reasonableness of defendant's actions in relation to his self-defense claim. In addition, defendant had several previous interactions with Box, and on nearly every occasion, Box carried at least one knife. In particular, on July 2, 2013, defendant saw Box sitting at a picnic table, brandishing a knife.

¶ 21    In response to defendant's *Lynch* proffer, the State presented testimony from Jeremy Swan, a former employee of the Freight House Tavern. Swan stated that he saw Box come into the bar a few times but never saw him fight anyone. The State then presented the testimony of Darin Spears, owner of the Freight House Tavern. Spears testified that he was not aware of a January 2013 fight occurring between Box and a person named Joshua Cowden.

¶ 22    The State also presented the testimony of Tonia Walker, another former employee of the Freight House Tavern. Walker testified that Box was involved in one "incident" while Walker was employed there. On the night of the incident, Box approached Walker and asked her whether the bar had surveillance cameras out back. Box told Walker that "I hit that guy." Walker told Box to leave the bar and Box complied without any resistance. Walker explained that the person Box hit had been disturbing other patrons all night.

¶ 23    Defendant then testified in rebuttal. He testified that one night in January 2013, he and Box were at the Freight House Tavern, smoking cigarettes outside in the beer garden. Defendant testified that Box motioned for Cowden to come over. When Cowden approached, Box punched him in the face, and Cowden fell to the ground. Box then looked at defendant and smiled. Box approached Cowden as he lay on the ground. Defendant intervened and advised Box that he should leave. Box went back into the bar.

¶ 24    The trial court decided "to permit the *Lynch* evidence, but very limited." The court allowed defendant to testify about the incident at the Freight House Tavern to establish defendant's knowledge of Box's character for violence, as it related to the reasonableness of defendant's actions in response to Box's aggression. However, the court prohibited defendant from introducing the testimony of other witnesses as to the incident at the Freight House. The court described defendant's written descriptions of those witnesses' expected testimony as "totally inaccurate and totally wrong, based on the testimony of the [other] individuals, including the defendant." The court added that "I see no reason that any of these other witnesses [should testify], because what they observed has no affect on [defendant's] state of mind. So they will not be permitted to testify."

¶ 25    The trial court then summarized its concerns as follows:

    "And the other thing I'm going to caution everybody right now about: I can see where this is going ***. That, again, the defense will want to make January of 2013 what this trial is about. That's not what this trial is about. I've stated what you will be

permitted to introduce evidence—now, have a seat, [defense counsel]—what you're permitted to present evidence about. But already here today we attempt to take the straightforward testimony of the defendant and add some nice fancy words to it and turn and twist it, and that's not going to happen, not going to happen to this jury."

¶ 26 On January 9, 2014, the State filed a second amended information. The new information again charged defendant with first degree murder (720 ILCS 5/9-1(a)(2) (West 2012)) but this time under a different theory than that alleged in the first amended information. The second amended information alleged that defendant stabbed Box, causing his death, knowing that the stabbing created a strong probability of death or great bodily harm.

¶ 27 On January 13, 2014—the day of trial—defendant filed a "motion to deny" the second amended information. Defendant argued that the second amended information charged him under a different subsection of the first degree murder statute than had the first amended information. Defendant contended that section 9-1(a)(2) contained a different *mens rea* requirement than section 9-1(a)(1). As a result, defendant argued, he now lacked time to adequately prepare for trial on the second amended information, which remained scheduled for January 13, 2014. Defendant requested that the trial court prohibit the State from charging first degree murder under section 9-1(a)(2).

¶ 28 Prior to trial, the trial court addressed defendant's pending motion "to deny" the State's second amended information. Defendant argued that the State filed the second amended information outside the seven-day window established by the trial court at the December 4, 2013, status hearing. The court reasoned that the State's first amended information was filed within the seven-day window, charging first degree murder, and that the second amended information also charged first degree murder, merely changing the subsection. Accordingly, the court denied defendant's motion "to deny" the second amended information.

¶ 29 Defendant then requested a continuance to prepare for trial on the second amended information. The State responded that, when charging first degree murder, the State is required to notify a defendant only that he is being charged with first degree murder, not to identify which subsection of first degree murder the State intends to pursue. The court denied defendant's motion for a continuance, finding that defendant had not pointed to anything about the trial or the evidence that had changed because of the second amended information.

¶ 30 Defendant again inquired about whether he could question the State's expert witnesses about the cause of death. The trial court responded, "No. The limitations as to whether or not the [victim's] seeking or not seeking medical treatment affected causation, and my ruling stands with regard to that. You may not go into those issues."

¶ 31 Defendant then requested a preliminary hearing on the State's second amended information, which the trial court denied.

¶ 32 B. The Trial Evidence

¶ 33 Casey Slusser testified that she was employed managing carnival games for Kenny Fox, who operated traveling carnivals. In July 2013, Slusser worked for Fox at the Schuyler County fair. She and Box were the only two employees who managed carnival games for Fox and, while traveling for work, both Slusser and Box lived together in the "game trailer," in which they had separate rooms. Slusser described Box as "my ex-boyfriend's best friend, and he was my protector."

¶ 34    Slusser testified further that on July 1, 2013, defendant visited the fairgrounds and socialized with other carnival workers. Slusser and Box began playing beer pong. After they finished playing, Box went back to his room. Slusser asked defendant if he wanted to come to her room. Defendant agreed, so he and Slusser went to her room, where they lay down and talked. After about two or three minutes, Box began yelling and banging on Slusser's door. Defendant exited Slusser's room, opening the door so hard that "it banged off the game trailer."

¶ 35    Slusser testified that as defendant exited the trailer, Box punched him in the face. Defendant took a couple steps backward before taking a knife out of his pocket. Defendant then stabbed Box with the knife in the left abdomen. Box fell into a pile of tires. Defendant said, "I'm sorry. I didn't mean to stab you," before running off.

¶ 36    Slusser took Box to the hospital, dropped him off there, and returned to the fairgrounds. Two days later, as she had done the day before, Slusser checked on Box in his trailer. She found Box lying dead and naked on the floor.

¶ 37    Dr. Mark Day testified that in the early morning hours of July 2, 2013, he treated Box at the hospital for a "small" stab wound. Day testified that it was difficult to examine Box because he was "very" uncooperative. Day tried to look at the wound, and Box "took a swipe at me." Day left the room for a few minutes because Box was not bleeding significantly. The "third or fourth time" that Day tried to evaluate Box, Box had passed out. At the time, Day did not think the stab wound penetrated Box's fascia. According to Day, "[T]he fascia is what's underneath the muscle, and if you don't have an injury to the fascia, you don't have a wound that you need to worry about that much." Day "reluctantly" stitched up Box's wound because "it was clear to me that he didn't want me doing anything else." Box later awakened and left the hospital.

¶ 38    Defendant testified that he was in Slusser's room when Box started yelling and pounding on Slusser's door for 20 or 30 seconds. Defendant decided it was time to go, so he opened Slusser's door and stepped outside. As he stepped onto the ground, he was punched in the face but did not see who hit him. As defendant staggered backward, he saw Box approaching him. Defendant pulled a folding knife out of his pocket and stabbed Box. Defendant testified that he stabbed Box because he was afraid for his life and did not know what else to do.

¶ 39    Dr. Amanda Youmans testified that she performed the autopsy of Box. She discovered gastric contents in Box's abdomen, indicating that the wound had penetrated Box's stomach. She opined that Box died from septic shock due to acute peritonitis resulting from a stab wound to the stomach.

¶ 40    At the State's request, and over defendant's objection, the trial court instructed the jury on second degree murder. The jury found defendant guilty of second degree murder. The trial court later sentenced defendant to 18 years in prison, noting defendant's extensive, violent criminal history.

¶ 41    This appeal followed.

¶ 42    II. ANALYSIS

¶ 43    Defendant argues that (1) the State violated the speedy trial statute by trying defendant for first degree murder more than 120 days after he was taken into custody, (2) the trial court erred by requiring defendant to first make a "preview" proffer of evidence of causation before cross-examining the State's witnesses or presenting his own evidence on that issue, (3) the

court abused its discretion by sustaining the State's objections that Day's testimony was unresponsive to defendant's questioning during cross-examination, (4) the court abused its discretion by limiting the corroborative evidence that defendant could present to establish Box's propensity for violence, (5) he was prejudiced by the State's second amended information—which charged a different theory of first degree murder than the first amended information—because no preliminary hearing was held on the new first degree murder charge and because the court denied his continuance for more time to prepare on the new charge, (6) the State engaged in improper rebuttal closing argument by "making fun of" defense counsel, and (7) his presentence custody credit must be applied to his probation operations and juvenile records assessments. We address defendant's arguments in turn.

¶ 44                                            A. Speedy Trial

¶ 45        Defendant argues that the State violated the speedy trial statute (725 ILCS 5/103-5 (West 2012)) by trying defendant for first degree murder more than 120 days after he was taken into custody.

¶ 46        We first provide a brief recap of the relevant facts. On July 5, 2013, defendant was taken into custody for the death of Box. On July 8, 2013, the State filed an information charging defendant with second degree murder (720 ILCS 5/9-2(a)(1) (West 2012)). On December 5, 2013, the State filed an amended information, this time charging defendant with first degree murder under section 9-1(a)(1) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/9-1(a)(1) (West 2012)), alleging that he stabbed Box knowing that the stabbing would cause Box's death. On January 9, 2014, the State filed a second amended information, again charging defendant with first degree murder, but this time under section 9-1(a)(2) (720 ILCS 5/9-1(a)(2) (West 2012)), asserting that defendant stabbed Box knowing that the stabbing created a strong probability of death or great bodily harm. Trial began on January 13, 2014, and ended on January 16, 2014.

¶ 47                               1. *Speedy Trial and Compulsory Joinder*

¶ 48        Illinois's speedy trial statute requires that every criminal defendant in custody shall be tried within 120 days of the date when he or she was taken into custody, excluding any delay occasioned by the defendant. 725 ILCS 5/103-5(a) (West 2012). The remedy for a violation of the speedy trial statute is dismissal of the charges. *People v. Sharifpour*, 402 Ill. App. 3d 100, 119, 930 N.E.2d 529, 547 (2010); 725 ILCS 5/103-5(d) (West 2012).

¶ 49        The speedy trial situation becomes more complicated when the State initially charges the defendant with one offense and then later charges an additional offense. Generally, the compulsory joinder statute, section 3-3 of the Criminal Code (720 ILCS 5/3-3 (West 2012)), requires that when the State knows that a defendant's act may constitute more than one offense, those offenses must be prosecuted in a single proceeding.

¶ 50        Further complications arise when the defendant causes or agrees to a delay in the trial proceedings on the initial charge or charges and the State later files an additional charge. "If the initial and subsequent charges filed against the defendant are subject to compulsory joinder, delays attributable to the defendant on the initial charges are not attributable to the defendant on the subsequent charges." *People v. Williams*, 204 Ill. 2d 191, 207, 788 N.E.2d 1126, 1136 (2003). The purpose of that rule is to prevent "trial by ambush." (Internal quotation marks omitted.) *People v. Phipps*, 238 Ill. 2d 54, 67, 933 N.E.2d 1186, 1194 (2010). That is, the

purpose is to prevent a situation where a defendant acquiesces to pretrial delays on a lesser charge while the State is preparing for trial on more serious charges that have not yet been filed. *Id.* Once the State files the new charges, the defendant is faced with "a Hobson's choice between a trial without adequate preparation and further pretrial detention to prepare for trial." *Williams*, 204 Ill. 2d at 207, 788 N.E.2d at 1137.

¶ 51    The rationale for the *Williams* rule is intended to ensure that a defendant "had adequate notice of the subsequent charges to allow preparation of a defense." *Phipps*, 238 Ill. 2d at 67, 933 N.E.2d at 1194. As a result, the *Williams* rule applies only when the subsequent charge filed by the State is "new and additional," thereby hindering the defendant's ability to prepare for trial on the subsequent charge. On the other hand, "[i]f the original charging instrument gives a defendant adequate notice of the subsequent charges, the ability to prepare for trial on those charges is not hindered in any way." *Id.*

¶ 52    In *Phipps*, the supreme court held "that the 'defendant could not have been surprised by the subsequent charges because they were essentially the same as the original ones.' " *Id.* at 70, 933 N.E.2d at 1195 (quoting *People v. Woodrum*, 223 Ill. 2d 286, 301, 860 N.E.2d 259, 270 (2006)). In such circumstances, "the defendant may proceed to trial on the subsequent charges with adequate preparation instead of being forced to agree to further delay." *Id.* at 68, 933 N.E.2d at 1194. The "critical point" is "whether the original indictment gave defendant adequate notice to prepare his defense to the subsequent charge." *Id.* at 69, 933 N.E.2d at 1195. We review *de novo* whether a subsequently filed charge is new and additional. *Id.* at 67, 933 N.E.2d at 1194.

¶ 53                  2. *Second Degree Murder as a Lesser-Mitigated Offense of*
                                    *First Degree Murder*

¶ 54    To better understand the nature of second degree murder and its relationship to first degree murder, we provide a brief synopsis of the statutory history of murder in Illinois. Upon the adoption of the Criminal Code of 1961, the criminal law in Illinois set forth three separate homicide offenses: *murder*, *voluntary manslaughter*, and *involuntary manslaughter*. Ill. Rev. Stat. 1961, ch. 38, ¶¶ 9-1, 9-2, 9-3. The first two offenses were identical but for the inclusion of a mitigating circumstance—that the defendant acted under either a sudden and intense passion or an unreasonable belief of justification—that distinguished voluntary manslaughter from murder. The relationship between the two offenses was summed up tidily by Professor Timothy P. O'Neill of the John Marshall Law School:

> "There are tensions between the roles of voluntary manslaughter as 'true crime' and as 'compromise verdict.' It is not a discrete crime, but merely a less culpable form of murder: murder with certain specified extenuating circumstances. It is a crime no one could ever deliberately intend to commit, but is rather an after-the-fact characterization of a defendant's actions. It is a homicide less serious than murder; yet it is not a lesser-included offense, since the act and basic mental state of each offense are identical." Timothy P. O'Neill, *"Murder Least Foul": A Proposal to Abolish Voluntary Manslaughter in Illinois*, 72 Ill. B.J. 306, 306 (1984).

¶ 55    Under the Criminal Code of 1961, the State bore the burden to establish a mitigating circumstance necessary to prove the lesser offense of voluntary manslaughter. *People v. Newbern*, 219 Ill. App. 3d 333, 349, 579 N.E.2d 583, 593 (1991). That arrangement led to a paradoxical situation because the State bore the burden of proving beyond a reasonable doubt

an element that benefited the defendant. And not infrequently, the prosecutor would argue to the jury that the State had failed to prove the mitigating element, while defense counsel would contend that the evidence had proved that element.

¶ 56   To correct that perverse system, the legislature enacted Public Act 84-1450 (eff. July 1, 1987), which changed the names of the offenses of *murder* and *voluntary manslaughter* to *first degree murder* and *second degree murder*, respectively. Substantively, the respective elements of those crimes did not change at all. The only substantive change brought by the act was to shift the burden to prove mitigation from the State to the defendant.

¶ 57   After Public Act 84-1450, second-degree murder was defined as follows:

> "(a) A person commits the offense of second degree murder when he commits the offense of first degree murder as defined in paragraphs (1) or (2) of subsection (a) of Section 9-1 of this Code and either of the following mitigating factors are present:
>
> (1) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed; or
>
> (2) At the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable.
>
> (b) Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.
>
> (c) When a defendant is on trial for first degree murder and evidence of either of the mitigating factors defined in subsection (a) of this Section has been presented, the burden of proof is on the defendant to prove either mitigating factor by a preponderance of the evidence before the defendant can be found guilty of second degree murder. However, the burden of proof remains on the State to prove beyond a reasonable doubt each of the elements of first degree murder and, when appropriately raised, the absence of circumstances at the time of the killing that would justify or exonerate the killing under the principles stated in Article 7 of this Code. In a jury trial for first degree murder in which evidence of either of the mitigating factors defined in subsection (a) of this Section has been presented and the defendant has requested that the jury be given the option of finding the defendant guilty of second degree murder, the jury must be instructed that it may not consider whether the defendant has met his burden of proof with regard to second degree murder until and unless it has first determined that the State has proven beyond a reasonable doubt each of the elements of first degree murder." 720 ILCS 5/9-2 (West 2000).

Under this more sensible arrangement, the onus is on the defendant to establish the facts necessary to mitigate *first degree murder* to *second degree murder*, should the defendant so wish.

¶ 58   Twenty-five years ago, in *Newbern*, 219 Ill. App. 3d at 352, 579 N.E.2d at 596, this court analyzed the relationship between second degree murder and first degree murder and explicitly disagreed with several decisions of other appellate court districts that had held that second degree murder is a lesser-included offense of first degree murder. In *Newbern*, this court began

its analysis of the relationship between second degree murder and first degree murder by quoting from a law review article by Professor O'Neill, as follows:

> " 'A lesser included offense has either fewer elements or a less culpable mental state. Second degree murder does not have fewer elements [than] first degree murder; indeed, it embodies all of first degree murder *plus* mitigating circumstances. Nor does second degree murder technically have a less culpable mental state; like first degree, it requires an intentional or knowing state of mind.' " (Emphasis in original.) *Id.* at 353, 579 N.E.2d at 596 (quoting Timothy P. O'Neill, *An Analysis of Illinois' New Offense of Second Degree Murder*, 20 J. Marshall L. Rev. 209, 224 (1986)).

¶ 59   The *Newbern* court then wrote the following:

> "In order to describe the relationship between first degree murder and second degree murder, it will not suffice for us to say what that relationship *is not*—namely, that second degree murder is not a lesser included offense of first degree murder. Instead, we must state what that relationship *is*, and we now hold that second degree murder is a *lesser mitigated offense* of first degree murder: It is a *lesser* offense because its penalties upon conviction are lesser (compare Ill. Rev. Stat. 1989, ch. 38, par. 1005-8-1(a)(1) (the penalty for first degree murder), with Ill. Rev. Stat. 1989, ch. 38, par. 1005-8-1(a)(4) (the penalty for second degree murder, a Class 1 felony)); and it is a *mitigated* offense because, as Professor O'Neill correctly explains, it is first degree murder *plus* defendant's proof by a preponderance of the evidence that a mitigating factor is present.
>
> We fully recognize that the concept of a lesser mitigated offense is new to Illinois law, but so is the statutory scheme underlying second degree murder. We conclude that it is erroneous to try to fit second degree murder, a *sui generis* offense under the Illinois criminal code, into the 'comfortable old shoe' of being a lesser included offense simply because no other recognized description seems to fit." (Emphases in original.) *Id.*

¶ 60   Four years later, the Supreme Court of Illinois addressed the same subject in *People v. Jeffries*, 164 Ill. 2d 104, 122, 646 N.E.2d 587, 595 (1995), and, citing this court's decision in *Newbern* approvingly, wrote the following:

> "[W]e reaffirm *** that the mental states required for voluntary manslaughter, now known as second degree murder, are identical to that required for first degree murder. *** Murder and second degree murder each require the same mental state: either *intent* or *knowledge*. [Citations.] Moreover, second degree murder is *not* a lesser included offense of murder. Section 2-9 of the Criminal Code of 1961 defines an included offense in pertinent part as an offense that '[i]s established by *** a less culpable mental state.' (Ill. Rev. Stat. 1987, ch. 38, par. 2-9(a).) Having determined that the mental states for murder and second degree murder are identical, it is evident that second degree murder is not a lesser included offense of first degree murder. Rather, second degree murder is more accurately described as a *lesser mitigated offense* of first degree murder. See *People v. Newbern* (1991), 219 Ill. App. 3d 333[, 579 N.E.2d 583] (second degree murder is a lesser offense because its penalties upon conviction are lesser, and it is a mitigated offense because it is first degree murder *plus* defendant's proof by a preponderance of the evidence that a mitigating factor is present)." (Emphases in original.)

- 12 -

¶ 61    3. *The Effect of the State Charging a Defendant With Second Degree Murder*

¶ 62    As previously mentioned, the State in this case initially charged the defendant with second degree murder before later charging him with first degree murder. Given the unique status of second degree murder in Illinois law, we need to analyze the legal effect of the State's doing so.

¶ 63    As the supreme court made clear in *Jeffries*, the *elements* of the crimes of first degree murder and second degree murder are the same. In other words, to convict a defendant of *either* first degree murder or second degree murder, the State must prove beyond a reasonable doubt the elements which constitute the crime of first degree murder. Only after the trier of fact has concluded that the State has done so may the trier of fact then consider whether a mitigating factor is present so as to reduce the defendant's conviction from first degree murder to second degree murder. To achieve such a reduction in the seriousness of the crime the defendant committed, the defendant bears the burden of proving the existence of a mitigating factor by a preponderance of the evidence.

¶ 64    Accordingly, when the State chooses to charge a defendant with second degree murder, all it is doing is conceding the existence of a mitigating factor, thereby removing from defendant the burden of proving a mitigating factor's existence. When the State charges a defendant with second degree murder, it must still prove all of the elements that underlie the offense of first degree murder. However, if the jury finds that the State has proved those elements beyond a reasonable doubt, the verdict of the jury would be that the defendant is guilty of second degree murder, not first degree murder. This result occurs because the State had effectively conceded the existence of the mitigating factor by charging the defendant only with second degree murder, not first degree murder. For example, in *People v. Burks*, 189 Ill. App. 3d 782, 785, 545 N.E.2d 782, 784 (1989), the Third District Appellate Court held that the State could elect to bring a charge of second degree murder without first charging the defendant with first degree murder. The Third District in *Burks* added the following: "By charging a defendant with second degree murder, the State is alleging that it can prove the elements of first degree murder, but is conceding the presence of mitigating factors. Under these circumstances[,] the defendant bears no burden to prove any mitigating factors." *Id.*

¶ 65    Consistent with this holding, Illinois Pattern Jury Instructions, Criminal, No. 7.01S (3d ed. 1992) (hereinafter, IPI Criminal 3d No. 7.01S), defines the offense of second degree murder when first degree murder is not charged as consisting of all of the elements of first degree murder. The Committee Comments to IPI Criminal 3d No. 7.01S cite *Burks* and *Newbern* and explain how the jury's verdict, if the State proves all the elements constituting first degree murder, should be that the defendant is guilty of second degree murder.

¶ 66    In 2009, the legislature revisited the second degree murder statute. Public Act 96-710 amended subsection (c) of the second degree murder statute to read as follows:

"When evidence of either of the mitigating factors defined in subsection (a) of this Section has been presented, the burden of proof is on the defendant to prove either mitigating factor by a preponderance of the evidence before the defendant can be found guilty of second degree murder. The burden of proof, however, remains on the State to prove beyond a reasonable doubt each of the elements of first degree murder and, when appropriately raised, the absence of circumstances at the time of the killing that would justify or exonerate the killing under the principles stated in Article 7 of this Code." Pub. Act 96-710 (eff. Jan. 1, 2010) (amending 720 ILCS 5/9-2(c)).

Excised by the amendment was the language discussing the practicalities of instructing the jury on second degree murder. However, the amendment to section 9-2(c) in Public Act 96-710 did nothing to change the relationship between first degree murder and second degree murder.

¶ 67    First degree murder and second degree murder require proof of the same elements, with the only difference being that second degree murder requires the additional proof of a mitigating factor. The mitigating factors available to create the offense of second degree murder should not be considered to mean that a less culpable mental state is in play. The two offenses are better thought of as different postures of the same offense. Second degree murder is not a separate crime from first degree murder; instead, it is a *mitigated* crime.

¶ 68                    4. *First Degree Murder Is Not a "New and Additional" Charge*
                                    *to Second Degree Murder*

¶ 69    The State, as in the present case, may choose to charge a defendant initially with second degree murder and later to charge him with first degree murder. Based upon the foregoing analysis of the relationship between first degree murder and second degree murder, we conclude that under those circumstances, first degree murder is not a "new and additional" charge to second degree murder. That is because the criminal behavior the State alleges the defendant engaged in regarding both charges—that is, first degree murder and second degree murder—is the same. The only difference between the two charges is the existence of a mitigating factor. If the State initially decides to concede the existence of a mitigating factor by charging the defendant with second degree murder and then changes its position by charging first degree murder, the *only* change is that the State no longer concedes the existence of a mitigating factor. That does *not* constitute a "new and additional" charge.

¶ 70    This conclusion is important because it means that the State's decision to charge defendant in the present case with first degree murder—that is, the State's decision to no longer concede the existence of a mitigating factor—did not implicate the compulsory joinder doctrine.

¶ 71    For purposes of compulsory joinder and the speedy trial statute, second degree murder is a lesser-mitigated offense that may be described as a different posture of first degree murder. When the State in this case charged first degree murder after having earlier charged second degree murder, defendant's ability to prepare was not hindered at all. We note again that the supreme court in *Phipps* held that the compulsory joinder doctrine did not apply where "the 'defendant could not have been surprised by the subsequent charges because they were essentially the same as the original ones.' " *Phipps*, 238 Ill. 2d at 70, 933 N.E.2d at 1195 (quoting *Woodrum*, 223 Ill. 2d at 301, 860 N.E.2d at 270). He was already prepared to defend against first degree murder because the offense of second degree murder already alleged that he had committed first degree murder. As defense counsel explained:

> "[T]o prove second-degree murder, you basically have to prove first-degree murder first. So this really changes nothing at all as far as our preparation and being ready for trial. All of the evidence is exactly the same as it was when the second-degree murder charge was the pending charge. And just as we answered a few weeks ago that we were ready for trial, we still are ready for trial."

Defense counsel was correct that a charge of second degree murder requires that the defendant prepare a defense against the elements of first degree murder. A subsequent charge of first

degree murder, then, does nothing to hinder the ability of a defendant to prepare. This was not "trial by ambush."

¶ 72     We acknowledge that this conclusion may seem at first blush difficult to understand, but as we explained in *Newbern*, the concept of a lesser-mitigated offense as contained in the second degree murder statute is new to Illinois and is *sui generis*. Just as we cautioned 25 years ago that second degree murder would not fit into the " 'comfortable old shoe' " (*Newbern*, 219 Ill. App. 3d at 353, 579 N.E.2d at 596) of being a lesser included offense simply because no other recognized description seems to fit, we conclude that the "comfortable old shoe" of the compulsory joinder statute does not fit, either.

¶ 73     We also acknowledge that our decision in this case is inconsistent with the decision of the Second District Appellate Court in *People v. Izquierdo-Flores*, 367 Ill. App. 3d 377, 386, 854 N.E.2d 1156, 1163 (2006), which held that the original second degree murder charges in that case and the later-filed first degree murder charges were based on the same act and were subject to compulsory joinder. The Second District reached this conclusion by deeming the later-filed first degree murder charges as "new and additional charges" subject to compulsory joinder under section 3-3 of the Criminal Code of 1961 (720 ILCS 5/3-3 (West 2000)). In explaining this conclusion, the Second District wrote the following: "[A]lthough the second indictment did not add any new elements to the charged offense, it did place on defendant a burden that did not exist before. A defendant charged with second degree murder is not required to prove anything." *Izquierdo-Flores*, 367 Ill. App. 3d at 383, 854 N.E.2d at 1161.

¶ 74     However, section 3-3 of the Criminal Code—the compulsory joinder statute—says nothing about a mitigating factor that a defendant need prove to reduce first degree murder to second degree murder. Further, that a defendant charged with second degree murder is not required to prove anything is totally irrelevant to the question of whether the compulsory joinder statute applies. Justice Bowman, who dissented in *Izquierdo-Flores*, noted that because of the "unique relationship between first- and second-degree murder," "when defendant was originally charged with second-degree murder, he was also, in effect, being charged with first-degree murder." *Id.* at 388, 854 N.E.2d at 1165 (Bowman, J., dissenting). Justice Bowman added the following: "Because the first-degree murder charges were essentially before the court from the beginning of the prosecution, and because the second indictment charging first-degree murder *did not add new elements* to the charged offense of second-degree murder, the first-degree murder charges did not constitute 'new and additional charges.' As a result, the compulsory joinder statute was not implicated ***." (Emphasis added.) *Id.* at 390, 854 N.E.2d at 1166.

¶ 75     We agree with Justice Bowman's dissent. As we explained earlier, the "comfortable old shoe" of the compulsory joinder statute does not fit the *sui generis* circumstances of mitigating factors as used in the second degree murder statute.

¶ 76                              B. Limitation on Evidence of Causation

¶ 77     Defendant next argues that the trial court erred by requiring defendant to first make a "preview" proffer of evidence of causation before cross-examining the State's witnesses or presenting his own evidence on that issue.

¶ 78     "Although any limitation on the right to cross-examine requires scrutiny, a defendant's rights under the confrontation clause are not absolute." *People v. Averhart*, 311 Ill. App. 3d 492, 497, 724 N.E.2d 154, 159 (1999). "The confrontation clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way and to

whatever extent the defense desires." (Emphasis in original.) *Id.* "A trial court should *** be unwilling to grant a motion *in limine* brought by the State if the result will be, for all practical purposes, an evisceration of the defendant's theory of the case." *People v. Prevo*, 302 Ill. App. 3d 1038, 1050, 706 N.E.2d 505, 513 (1999). The appropriate question is whether the limitation on cross-examination created "a substantial danger of prejudice by depriving [the defendant] of the ability to test the truth of the witness's direct testimony." (Internal quotation marks omitted.) *People v. Harris*, 123 Ill. 2d 113, 145, 526 N.E.2d 335, 348 (1988).

¶ 79    Here, to be clear, the trial court did not *prohibit* defendant from cross-examining the State's witnesses on the issue of causation. Instead, the court merely required that, before defendant asked specific questions in cross-examination, defendant first make a proffer to show that there was a factual basis for the questioning. As the court said: "So, if the defense intends to actually question the State's causation evidence, I think they're entitled to do that, but then they're going to have to come up with, with actual evidence of that, not just their own speculation of what might have happened." In short, the court sought to prevent a "fishing expedition" in front of the jury. If defendant had a legitimate factual basis to question the State's witnesses or introduce other testimony about causation, he was free to do so. All that was required of him was to first explain—outside the presence of the jury—what testimony he expected to elicit. This limitation on the right to cross-examination did not create a substantial danger of prejudice.

¶ 80    Of greater importance to our decision to reject defendant's argument is that he failed to make an offer of proof regarding the evidence the trial court allegedly improperly kept out. See *People v. Patterson*, 2014 IL 115102, ¶ 123, 25 N.E.3d 526 (where the supreme court rejected the defendant's argument that the trial court erred in denying his evidentiary request was not subject to review because the defendant failed to make an offer of proof). As this court wrote in *People v. Pelo*, 404 Ill. App. 3d 839, 875, 942 N.E.2d 463, 493 (2010), a case in which the defendant was similarly arguing that the trial court erred by granting the State's motion *in limine* to exclude certain testimony, "[f]ailure on the part of a defendant to make a proper offer of proof forfeits review of his challenge to the trial court's granting of a motion *in limine*." We explained in *Pelo* that because the defendant failed to make an adequate offer of proof, "we have no way of knowing whether the excluded testimony would have (1) been admissible or (2) assisted the jury in its determination of guilt. Thus, defendant's failure to make an adequate offer of proof deprives this court of the record required to determine whether the court abused its discretion by granting the State's motion *in limine* ***." *Id.* at 877, 942 N.E.2d at 495. The same analysis applies in this case.

¶ 81                                    C. Unresponsive Witnesses

¶ 82    Defendant next argues that the trial court abused its discretion by sustaining the State's objections that Day's testimony was unresponsive to defendant's questioning during cross-examination. Specifically, the State objected to Day's testimony that he stopped examining Box "[t]o keep from getting my head knocked off from him" and that, "Frankly, this guy scared me." In response, the court sustained those objections and struck Day's responses. Defendant argues that only the questioning party (here, defendant) has the "standing" to request that a nonresponsive answer be stricken. The State responds that defendant forfeited this issue by failing to raise it in the trial court. Defendant counters that we should consider his claim under the plain-error doctrine.

- 16 -

¶ 83    The only case defendant cites for the proposition that only the questioning party has "standing" to object on grounds of nonresponsiveness is *People v. Sweeney*, 46 Ill. App. 3d 858, 867, 361 N.E.2d 344, 351 (1977). Even if that proposition is generally correct, a trial court nonetheless has wide latitude to control and manage cross-examination. We see no reason why a trial court should be constrained from striking testimony it deems improper based upon which party made the request. We conclude that here, the trial court did not abuse its discretion.

¶ 84    We also note that to the extent defendant claims that the jury needed to hear that Box was violent, that evidence was already before the jury. Day had testified that it was difficult for him to examine Box because he was "very" uncooperative, and when Day tried to look at the wound, Box "took a swipe at [him]." Day was permitted to demonstrate how Box had twice balled a fist as if to punch him and how Box had "scared" Day. Day testified that he feared for his own safety and thought he was going to be hurt by Box. Given all of the above, we conclude that the trial court merely was exercising its discretion by limiting cumulative evidence.

¶ 85                              D. Corroborating Witnesses

¶ 86    Defendant next argues that the trial court abused its discretion by limiting the corroborating evidence that defendant could present to establish Box's propensity for violence. Specifically, pretrial, defendant moved to introduce evidence of two witnesses who saw Box hit a man at the Freight House Tavern, an event which defendant also allegedly witnessed. The court ruled that although *defendant* was permitted to testify about what he saw Box do at the Freight House Tavern that night, defendant was prohibited from presenting corroborating witnesses on that issue. Defendant argues that the corroborating witnesses would have bolstered his testimony about Box's propensity for violence, which, in turn, was relevant to show that Box, not defendant, was the initial aggressor in the conflict between defendant and Box.

¶ 87    As we mentioned earlier, a trial court has wide latitude to manage its courtroom. That discretion includes the ability to limit the amount of corroborating testimony on a given issue. See, *e.g.*, *People v. Donegan*, 2012 IL App (1st) 102325, ¶ 62, 974 N.E.2d 352 (acknowledging the trial court's discretion to limit the number of prior inconsistent statements that may be introduced).

¶ 88    We note that when the trial court conducted a hearing on defendant's proffers of evidence concerning the January 2013 incident at the Freight House Tavern in Beardstown involving Box, the court was informed regarding what defendant would say about that incident, as well as what the testimony would be of other witnesses whom the State would present. The court permitted defendant to testify about the events at the Freight House Tavern, and defendant did so without the State's presenting any contrary evidence and without the State's arguing that the defendant's version of events at the Freight House Tavern was not believable. By barring other witnesses from testifying about the January 2013 incident at the Freight House Tavern, the court explained that it was intending to avoid a mini-trial on those events so as to avoid confusing the issues for the jury. We conclude that the trial court did not abuse its discretion in so doing.

¶ 89                                    E. Defendant's Claim He Was Entitled to
                                          a Preliminary Hearing on the New Charge

¶ 90        Next, defendant argues that he was prejudiced by the State's second amended information—which charged a different theory of first degree murder than the first amended information—because no preliminary hearing was held on the new first degree murder charge and because the trial court denied his continuance for more time to prepare on the new charge. We reject both arguments.

¶ 91        Defendant argues that he was prejudiced by the State's second amendment information because no preliminary hearing was held on the new first degree murder charge contained therein. In support of his claim that he was entitled to a preliminary hearing, defendant cites *People v. Kincaid*, 87 Ill. 2d 107, 125, 429 N.E.2d 508, 515 (1981), but that case is inapposite. In *Kincaid*, the defendant was charged in a two-count information with indecent liberties with a child and contributing to the sexual delinquency of a child (Ill. Rev. Stat. 1977, ch. 38, ¶¶ 11-4, 11-5). The first charge was a Class 1 felony, while the second was a Class A misdemeanor. The trial court permitted the State to amend the information charging indecent liberties with a child because the original charge omitted the essential element of the age of the victim. *Kincaid*, 87 Ill. 2d at 120, 429 N.E.2d at 513. The supreme court held that the trial court did not err by permitting the amendment and affirmed the defendant's conviction. *Id.* at 122-23, 429 N.E.2d at 514. In so doing, the supreme court noted that "[a] better procedure would be to allow the State's Attorney to amend an information to include essential elements of the crime charged only when such amendment is made before trial, a prompt preliminary hearing is held to determine probable cause, and the defendant is allowed to plead anew and is afforded a reasonable time to further prepare his defense." *Id.* at 125, 429 N.E.2d at 515.

¶ 92        The holding in *Kincaid* does not apply to the present case because in *Kincaid*, the only *felony* charge was defective, so when it was amended to overcome that deficiency, a new preliminary hearing was appropriate. In the present case, a previous, appropriately charged felony (second degree murder) had already been filed against the defendant and a preliminary hearing had been conducted in July 2013 before the trial court permitted the State to file the new first degree murder information. Thus, the rule declared by the Supreme Court of Illinois in *People v. Redmond*, 67 Ill. 2d 242, 246, 367 N.E.2d 703, 705 (1977), applies to the present case, where the supreme court wrote the following:

            "The defendant repeats here his contention that section 111-2(e) [of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, ¶ 111-2(e))] violates an accused's right to a prompt preliminary hearing to establish probable cause as declared in article I, section 7, of our constitution, because, he says, the constitutional provision requires a probable cause determination for *each separate charge* which might be brought in a criminal information. The defendant's contention cannot be supported." (Emphasis added.)

      This means that once a trial court, after conducting a preliminary hearing, has determined that probable cause exists for *any* felony offense with which the defendant is charged, that is all the trial court need determine before concluding that (1) the State has met its burden at the preliminary hearing and (2) the defendant should be held for trial on *all* of the charges then pending against him.

¶ 93        For purposes of clarification, assume a case in which the State has charged the defendant in a three-count information with attempt (murder) (count I), aggravated discharge of a firearm

                                              - 18 -

(count II), and aggravated battery (count III). The issue at the preliminary hearing in this case would be whether the State can present sufficient evidence so that the trial court has probable cause to believe (1) that a felony offense has been committed and (2) the defendant committed it. If at the close of the preliminary hearing, the court can determine that the State has met its burden of proof regarding aggravated battery (count III), which might typically be the easiest charge for which the State can meet its burden, then the trial court should state its finding regarding count III, proceed to arraign the defendant on all three charges contained in the information, and, when the defendant enters the expected not guilty plea, set the case for trial on all three charges. In this scenario, the court need not and should not make any findings regarding counts I and II of the information.

¶ 94    This conclusion is consistent with the primary purpose of the Illinois Constitution's requirement of a proper preliminary hearing, as the supreme court explained in *Redmond*. That purpose "is to insure that a defendant is not held without a prompt showing of probable cause." *Id.* The supreme court also quoted from the remarks by one of the delegates to the 1970 constitutional convention, as follows:

> " 'The theory of the requirement in our law that a person should not be required to stand trial or, for that matter, be held in extended custody without a preliminary hearing and a judicial determination of probable cause, is old and is rather simple. It is that when a person is charged with a crime by a member of the executive branch of government, be he a police officer or be he a prosecuting attorney, that for the protection of the individual there should be some independent determination by a judge that there is, in fact, some good reason for holding this individual in custody, and that's what lawyers mean when they use the technical shorthand of a judicial determination of probable cause.
>
> The judge, when he determines probable cause, in effect, asks, "What's this all about? Was there a good reason for the policeman to take this person into custody and charge him with a crime, if the case came up initially that way, by an arrest without a warrant?" If the arrest was commenced pursuant to a warrant, then that hearing has already been held, at least to the extent that the judge had to be persuaded that there was a reason to issue the arrest warrant. This is one of the very, very basic protections in principle in our law for individuals against unwarranted arrest, unwarranted custody, and unwarranted prosecution.' 3 Proceedings 1450-51.
>
> Later Mr. Weisberg was questioned as to whether a second preliminary hearing would be required if an accused was bound over to the grand jury after a preliminary hearing on one charge and a true bill returned by the grand jury charged another offense. He expressed the opinion that the accused would be entitled to a second preliminary hearing if the new charge were 'completely unrelated' and 'fundamentally different.' (We need not consider the correctness of this view under the facts here.) The delegate went on to say:
>
> > 'I don't think it is the intention or the contemplation of the committee that a further preliminary hearing would be required if the offense was substantially the same one on which he received a preliminary hearing before being bound over to the grand jury.' 3 Proceedings 1452." *Id.* at 247-48, 367 N.E.2d at 705-06.

¶ 95    The limited function served by the preliminary hearing is a judicial determination as to whether the defendant charged by the executive branch of government should be held to bail. In the scenario discussed earlier, once the court determines that there is probable cause to believe that defendant committed the offense of aggravated battery, he will be held to whatever bail the court deems appropriate on the three-count information, and nothing is gained by the court's addressing the other two counts. After all, if a prosecution may be properly brought on an attempted murder charge arising from the same transaction as an aggravated battery charge for which probable cause was found without the need for a separate preliminary hearing on the attempted murder charge (which is the factual situation in *Redmond*), how can a defendant claim to be entitled to specific findings as to all charges just because the prosecutor elected to file them prior to the preliminary hearing?

¶ 96    Further, a finding in this hypothetical case of no probable cause as to counts I and II would be mere surplusage due to the finding of probable cause as to the aggravated battery charge. There is no bar to a subsequent trial of the defendant on all of the charges in the information as originally brought. Thus, if after finding probable cause regarding the aggravated battery charge, the trial court made a further finding, for example, of no probable cause as to the attempt (first degree murder) charge, it would be mere surplusage and *ultra vires*.

¶ 97    For the reasons stated, we conclude that defendant was not entitled to a new preliminary hearing on the newly filed first degree murder charge.

¶ 98    We also note that "[w]hile our statute describes three 'types' of murder, first degree murder is a single offense. As we have explained on numerous occasions, ' "the different theories embodied in the first degree murder statute [citation] are merely different ways to commit the same crime." ' [Citation.]" *People v. Smith*, 233 Ill. 2d 1, 16, 906 N.E.2d 529, 537 (2009). "Just as the method of committing murder is not integral to the offense and therefore need not be specified in the charging instrument [citation], so, too, *** the precise statutory theory of the offense of murder is not a matter that must be specifically alleged." *People v. Maxwell*, 148 Ill. 2d 116, 137, 592 N.E.2d 960, 970 (1992). This is yet another reason there was no need for a new preliminary hearing, and defendant had no right to demand a continuance.

¶ 99                        F. Closing Argument

¶ 100   Defendant argues that the State engaged in improper rebuttal closing argument by "making fun of" defense counsel.

¶ 101   Defendant points to the following specific comments made by defense counsel during rebuttal closing argument:

> "I'm sorry. I'm [*sic*] don't have a lot of 16-cylinder words to give you like [defense counsel] is so eloquent is [*sic*] doing. I just don't understand half of them. If I did, I wouldn't use them on you. But, you know, that's his style; he's a very eloquent speaker, but don't let him smokescreen what's going on here. He used words like to you folks [*sic*] the criminal mens rea. I bet you don't know what that is. Harkening back, percipient knowledge, indicia of shearing. I don't know if I was in a biology class or a speech class here today. This is about a man that died because he got stabbed by that guy. That's what happened. And he can sugarcoat it with all those fancy words and his pounding—I hope he didn't hurt his fist—his yelling, screaming at you, his theatrics don't mean a thing."

¶ 102     Defendant is correct that "personal attacks upon defense counsel" are "unprofessional and highly improper." *People v. Burnett*, 27 Ill. 2d 510, 518, 190 N.E.2d 338, 342 (1963). "[S]tatements may not be made in closing arguments solely to arouse and inflame the passions of the jury." *People v. Lucas*, 132 Ill. 2d 399, 437, 548 N.E.2d 1003, 1019 (1989). Improper remarks during closing arguments do not constitute error unless they result in substantial prejudice to the accused. *Id.* In this case, defendant's argument strikes us as fanciful and overly sensitive. We interpret the State's comments as an explanation to the jury about terms such as *mens rea* that the jurors may not have understood. The State was attempting to ensure that the jury did not deliberate and reach a decision based on confusion. The State's argument was an attempt to frame the jury's task as simply as possible: "This is about a man that died because he got stabbed by that guy." Defendant's contention that these comments by the State rose to the level of substantial prejudice is unpersuasive. In rejecting defendant's argument, we reiterate what this court wrote nine years ago in *People v. Montgomery*, 373 Ill. App. 3d 1104, 1118, 872 N.E.2d 403, 415 (2007):

> "To slightly revise a common saying regarding campaigning for elective office, trying felony cases before a jury 'ain't beanbag.' These are serious matters with high stakes, and we expect advocates in our adversary system of justice to use all of their forensic skills to persuade the jury of the wisdom or justice of their respective positions. Certainly, defense counsel in this case vigorously attacked the State's case and the State's witnesses, and we should expect no less vigor from the prosecutor. Of course, counsel are not free in their closing arguments to say anything they might wish. Limitations exist, but there is no restriction on argument because a party takes offense to the harshness of the opponent's closing argument."

¶ 103                              G. $5-Per-Day Credit

¶ 104     Last, defendant argues that his presentence custody credit must be applied to the following two "fines": (1) $10 "Probation Op 705 ILCS 105/27.3a(1.1)" assessment and (2) "Juvenile Records 730 ILCS 5/5-9-1.17."

¶ 105     The State concedes that the juvenile records assessment is a fine to which the presentence custody credit is applicable. We accept the State's concession.

¶ 106     A probation operations assistance assessment (705 ILCS 105/27.3a(1.1) (West 2012)) operates as a fee when it "reimburses the State for costs incurred as the result of prosecuting the defendant." *People v. Rogers*, 2014 IL App (4th) 121088, ¶ 37, 13 N.E.3d 1280. However, when the probation office is not involved in a defendant's prosecution, the probation assessment acts as a fine. In this case, the probation office was involved in creating a presentence investigation in defendant's case. Therefore, the assessment is a fee to which defendant's sentencing credit does not apply.

¶ 107     We therefore order the circuit clerk to apply defendant's sentencing credit to his $10 juvenile records assessment.

¶ 108                              III. CONCLUSION

¶ 109     For the foregoing reasons, we affirm the trial court's judgment and order the circuit clerk to apply defendant's presentence custody credit to his $10 juvenile records assessment.

¶ 110  As part of our judgment, we award the State its $75 statutory assessment against defendant as costs of this appeal. 55 ILCS 5/4-2002 (West 2014).

¶ 111  Affirmed as modified and remanded with directions.